No. 2023-1558

IN THE

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

_____

In re: FISHER & PAYKEL HEALTHCARE LIMITED,

*Appellant,*

APPEAL FROM THE U.S. PATENT AND TRADEMARK OFFICE
Case No. 15/633,557

**BRIEF OF APPELLANT FISHER & PAYKEL HEALTHCARE**

BENJAMIN J. EVERTON
  *Counsel of Record*
JAROM D. KESLER
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

*Attorneys for Appellant*
FISHER & PAYKEL HEALTHCARE LTD.

August 14, 2023

**Exemplary Patent Claims**
**Application No. 15/633,557**

1.  An expiratory tube comprising:

a first end connector terminating a first end of the expiratory tube, wherein the first end connector is configured to connect to a ventilator;

a second end connector terminating a second end of the expiratory tube, wherein the second end connector is configured to connect to a patient interface component; and

a flexible enclosing wall defining a single gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible enclosing wall including corrugations and formed entirely of a hydrophilic polyester block copolymer material, wherein the flexible enclosing wall separates the single gases flow passageway from ambient air, the corrugated hydrophilic polyester block copolymer material configured to reduce humidity of gases in the single gases flow passageway by diffusion from the single gases flow passageway through the flexible enclosing wall directly to ambient air;

wherein the expiratory tube forms an expiratory limb of a breathing circuit.

\*\*\*

11.    An expiratory tube comprising:

a first end connector terminating a first end of the expiratory tube;

a second end connector terminating a second end of the expiratory tube; and

a flexible enclosing wall defining a gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible enclosing wall including corrugations and formed exclusively of a hydrophilic polyester block copolymer material that is configured to reduce humidity of gases in the gases flow passageway through diffusion directly to ambient air;

wherein the expiratory tube forms an expiratory limb of a breathing circuit.

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Fisher & Paykel Healthcare Limited certifies that:

1.      The full name of every party represented by me is:

Fisher & Paykel Healthcare Limited

2.      The name of the real party in interest represented by me is:

None.

3.      All parent corporations or publicly held companies own 10 percent or more of the stock of the party represented by me:

Fisher & Paykel Healthcare Corporation Limited

4.      The name of all law firms and the partners or associates that appeared for the party now represented by me in the lower tribunal or are expected to appear for the party in this Court (and who have not or will not enter an appearance in this case) are:

Michael Guiliana, Villamar & Guiliana

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

6.      Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

KNOBBE, MARTENS, OLSON & BEAR, LLP

August 14, 2023           /s/  *Benjamin J. Everton*
                          Benjamin J. Everton

                          *Attorneys for Appellant*
                          FISHER & PAYKEL HEALTHCARE LIMITED

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Fisher & Paykel Healthcare Limited ("FPH") states as follows: No other appeal in or from the same proceeding was previously before this or any other appellate court.  There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# TABLE OF CONTENTS

**Page No.**

STATEMENT OF RELATED CASES ................................................................ iii

I.      JURISDICTION .................................................................1

II.     STATEMENT OF THE ISSUES ...............................................1

III.    STATEMENT OF THE CASE ...................................................2

      A.     Appellant FPH and the Technology .................................3

      B.     The Present Application And Claims..............................5

      C.     The Earlier Patent Claims and Prior Art .......................6

      D.     Examiner's Double Patenting Rejections .......................9

           1.      Rejection Over Smith '366 Claim 4 and Huddart ..............10

           2.      Rejection over Smith '020 Claim 7 and Huddart ..............11

      E.     The Board's Decision On Appeal ................................12

IV.    SUMMARY OF THE ARGUMENT ......................................14

V.     ARGUMENT..................................................................17

      A.     Standard of Review and Legal Standards ....................17

      B.     The Board Erred In Affirming The Rejection Based On Claim 4 Of Smith '366 ................................................19

           1.      It is undisputed that the prior issued Claim 4 would require modification to address the "entirely" limitation .......................................................19

           2.      The Rejection Confused Domination With Double Patenting............................................................20

# TABLE OF CONTENTS

## (*cont'd*)

**Page No.**

        a.    The Board's analysis merely establishes
domination, not double patenting ............................20

        b.    FPH's domination argument was timely and
proper ....................................................................22

    3.    The Board Committed Legal Error By
Disregarding Mr. Eaton's Unrebutted Testimony ..............23

        a.    Mr. Eaton's Level of Ordinary Skill in the
Art ........................................................................24

        b.    Mr. Eaton Did Not Fail to Consider
Enablement ............................................................27

        c.    Mr. Eaton's evidence of cost considerations
is relevant to obviousness .......................................28

    4.    The Board Erred in Affirming a Rejection That Is
Unsupported and Contrary to the Evidence ......................29

        a.    The Board's material modification to Smith
'366 Claim 4 is unsupported and disregards
the evidence ...........................................................29

        b.    The Board's Corrugation Modification is
Unsupported and Disregards the Evidence ..............34

  C.    The Board Erred In Affirming The New Rejection Based
On Claim 7 Of Smith '020 ...........................................................36

VI.    CONCLUSION ....................................................................................40

APPENDIX OF CLAIMS.................................................................................41

INDEX OF APPENDED MATERIALS .........................................................47

# TABLE OF AUTHORITIES

**Page No(s).**

*AbbVie, Inc. v. Kennedy Inst. of Rheumatology Trust*,
    764 F.3d 1366 (Fed Cir. 2014) ....................................................................21

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
    580 F.3d 1340 (Fed. Cir. 2009) ..................................................... 14, 16, 17

*Atofina v. Great Lakes Chem. Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ....................................................................21

*Dickinson v. Zurko*,
    527 U.S. 150 (1999)....................................................................................18

*In re Emert*,
    124 F.3dat 1460 ..........................................................................................17

*In re Farrenkopf*
    713 F.2d 714 (Fed. Cir. 1983) ............................................................. 28, 29

*In re Gartside*,
    203 F.3d 1305 (Fed Cir. 2000) ...................................................................17

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
    195 F.3d 1322 (Fed Cir. 1999) ...................................................................17

*In re Goodman,*
    11 F.3d 1046 (Fed. Cir. 1993) ....................................................................17

*In re Hedges*,
    783 F.2d 1038 (Fed. Cir. 1986) ........................................................... 32, 33

*In re Hubbell*,
    709 F.3d 1140 (Fed. Cir. 2013) ..................................................................17

*Ex Parte J. Marc Simard & Mingkui Chen*,
    No. 2017-007262, 2019 WL 1125741 (P.T.A.B. Feb. 13, 2019).................21

# TABLE OF AUTHORITIES

## (*cont'd*)

**Page No(s).**

*In re Kaplan*,
    789 F.2d 1574 (Fed. Cir. 1986) ...................................................... 20, 21, 31

*In re Jacoby*
    309 F.2d 513 (CCPA 1962) ..........................................................26

*Knowles Elecs. LLC v. Iancu*,
    886 F.3d 1369 (Fed. Cir. 2018) ...................................................18

*Michigan v. E.P.A.*,
    576 U.S. 743 (2015)......................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).......................................................................18

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    518 F.3d 1353 (Fed. Cir. 2008) ...................................................18

*In re Sarett*,
    327 F.2d 1005 (CCPA 1964) ........................................................21

*Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*,
    701 F. App'x 942 (Fed. Cir. 2017) ..............................................18

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
    611 F.3d 1381 (Fed. Cir. 2010) ...................................................18

*In re Van Ornum*,
    686 F.2d 937 (CCPA 1982) ..........................................................21

*In re Vogel*,
    422 F.2d 438 (1970).......................................................................17

# TABLE OF AUTHORITIES

## (*cont'd*)

**Page No(s).**

## OTHER AUTHORITIES

5 U.S.C. § 706 ................................................................18

35 U.S.C. § 103 ...............................................................13

35 U.S.C. § 112 ...............................................................13

35 U.S.C. § 141 .................................................................1

37 C.F.R. § 1.304 ..............................................................1

37 C.F.R. § 90.3 ................................................................1

# I.  **JURISDICTION**

This is an appeal from a Decision on Appeal entered by the Patent Trial and Appeal Board ("Board").  This Court has jurisdiction over this appeal under 35 U.S.C. § 141(a), 37 C.F.R. § 1.304.  The Board's Final Decision was entered October 5, 2022.  Appx1.  A request for rehearing of the Decision On Appeal was timely filed on December 5, 2022.  The Decision On Request for Rehearing was entered by the Board on December 29, 2022.  FPH filed its Notice of Appeal on February 27, 2023, Appx1010, making the appeal timely (within 63 days of the action on the request for rehearing) under 37 C.F.R. § 90.3(b)(1).

# II.  **STATEMENT OF THE ISSUES**

1.    Did the Board commit legal error by confusing domination with double patenting in affirming the Examiner's Nonstatutory Double Patenting Rejections based on Claim 4 of Smith '366?

2.    Did the Board err in overlooking FPH's unrebutted expert evidence that a POSITA would not have modified Claim 4 of Smith '366 to exclude expiratory tubes in which less than the entire wall is formed of hydrophilic polyester block copolymer material?

3.    Did the Board err in overlooking FPH's unrebutted expert evidence that a POSITA would not have had a reasonable expectation of success in making a corrugated tube entirely out of hydrophilic polyester block copolymer material?

1

4.     Did the Board err in affirming the Examiner's Nonstatutory Double Patenting Rejections based on Claim 4 of Smith '366 because it lacked substantial evidence?

5.     Did the Board err in finding there is no patentable distinction between a tube "substantially all" of which is formed of hydrophilic polyester block copolymer material and a tube formed "entirely" of such material?

### III.  **STATEMENT OF THE CASE**

The Board affirmed two grounds of rejection:

(1) nonstatutory double patenting rejection of the pending claims over Claim 4 of U.S. Patent No. 7,140,366 ("Smith '366") in view of WIPO Publ. No. WO 97/18001 to Huddart et al. ("Huddart"); and

(2) nonstatutory double patenting rejection of Claims 11, 12, 14-17, 19, 20, and 22 over Claim 7 of U.S. Patent 9,802,020 ("Smith '020") in combination with Huddart.

As will be explained, these rejections fail at least because the expiratory tubes recited by the rejected claims have walls that are formed "entirely," "exclusively," or "consisting essentially" of a hydrophilic polyester block copolymer material, which limitations are not recited in prior issued claims or the prior art.  In contrast, the prior issued claims only recited "at least a region" and "substantially all of an outer portion" of the tube being made of such a material.

The Board disregards the fact that the present Application discloses several different expiratory tube embodiments, some of which have only portions made of a breathable material and others in which the entire tube is made of the breathable material.  More importantly, the only evidence of record shows that a POSITA would not have modified the prior issued claims to require the "entirely" limitation given the nature of breathable materials.

Additionally, with regard to rejected Claims 1 and 11, the rejections also fail because the claimed tubes in the Smith references and Huddart's tubes are not corrugated hydrophilic polyester block copolymer material, and the only evidence of record shows that a POSITA would not have found it obvious to corrugate a tube made of such a material.

## A.     Appellant FPH and the Technology

Appellant Fisher & Paykel Healthcare Limited ("FPH"), is a significant worldwide provider of respiratory humidifiers and breathing tubes for ventilation. FPH sells expiratory tubes exhibiting the features claimed in the present Application under the name EVAQUA™ as described at:

https://www.fphcare.com/us/products/evaqua-breathing-circuits/.

The claimed inventions relate to expiratory tubes for humidified respiratory assistance devices (such as ventilators).[1]  Exhaled gas, which leaves a patient saturated with humidity, condenses within an expiratory tube as the air cools while traveling along the expiratory tube.  This condensation (also known as "rain-out"), is bad for the ventilator (could damage components, such as the flow sensor), bad for the patient (may impede or block the flow of gases, or may be inhaled), and bad for the staff (repeatedly draining the tube of the pathogen-laden condensation).  The claimed expiratory tube includes features that allow the passage of water vapor out of the tube without allowing the passage of liquid water or respiratory gases.  By allowing the passage of water vapor out of the expiratory tube, the humidity of the gases being carried by the expiratory tube can decrease such that there will be less condensation inside the breathing tube.  The Specification of the present Application teaches several different specific ways of making a useable breathable expiratory tube.  Prior issued patents in the family chain claimed some of those approaches.  The present Application claims a separate embodiment not previously claimed.

---

[1] In respiratory circuits, a limb is a type of tube.  For example, a circuit might include an inspiratory limb and an expiratory limb which are tubes that convey gases to and from the user, respectively.

**B.**    **The Present Application And Claims**

The specification of the present Application provides many different types of expiratory tubes that can include breathable materials.  An example of a type of breathable material is hydrophilic polyester block copolymer which includes the specific material SYMPATEX®.  Appx49 ([0028]).  Some of the described embodiments relate to expiratory tubes in which some portions of the tube wall are made of the breathable material but other portions are not.  This allows other materials to provide structure that breathable materials inherently lack.  For example, the Application describes embodiments in which the expiratory tube has longitudinal strips of breathable membrane as part of the tube wall.  Appx49 ([0025]).

The Application describes other expiratory tubes in which the wall is made entirely of the breathable material.  For example, Figure 6 illustrates an alternative embodiment in which the entire flexible wall of the tube is formed from a breathable plastic membrane.  Appx49 ([0029]), Appx69.  The breathing tubes recited by the rejected claims are directed to this type of alternative embodiment with walls that are formed "entirely," "exclusively," or "consisting essentially" of a hydrophilic polyester block copolymer material.

While the rejections of Claims 1-5, 7, 8, 10-12, 14-17, 19, 20, and 22-31 all are appealed, the independent claims subject to this appeal are Claims 1, 11, and

23. Claim 1 is provided below for reference. The remaining claims are provided in the Appendix of Claims.

> 1.    An expiratory tube comprising:
>
> a first end connector terminating a first end of the expiratory tube, wherein the first end connector is configured to connect to a ventilator;
>
> a second end connector terminating a second end of the expiratory tube, wherein the second end connector is configured to connect to a patient interface component; and
>
> a flexible enclosing wall defining a single gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible ***enclosing wall including corrugations and formed entirely of a hydrophilic polyester block copolymer material***, wherein the flexible enclosing wall separates the single gases flow passageway from ambient air, the corrugated hydrophilic polyester block copolymer material configured to reduce humidity of gases in the single gases flow passageway by diffusion from the single gases flow passageway through the flexible enclosing wall directly to ambient air;
>
> wherein the expiratory tube forms an expiratory limb of a breathing circuit.

## C.    The Earlier Patent Claims and Prior Art

Claims 1-5, 7, 8, 10-12, 14-17, 19, 20 and 22-31 were rejected based on a nonstatutory double patenting rejection over Claim 4 of Smith '366 in view of Huddart.

'366 Patent Claim 4 depends from Claim 1, both of which are provided below:

> 1. A limb for a breathing circuit comprising:
> an inlet,

an outlet, and

an enclosing wall defining a substantially singular exhalation flow passage between said inlet and said outlet, ***at least a region of said enclosing wall being of a material*** that allows the passage of water vapour without allowing the passage of liquid water or respiratory gases

a water vapour flow path from said exhalation flow passage to ambient air through said material, and

wherein said limb is an expiratory limb of the breathing circuit.

4. A limb for a breathing circuit as claimed in claim 1 wherein said ***material is a hydrophilic polyester block copolymer***.

Appx1052 (emphasis added).

WIPO Publ. No. WO 97/18001 to Huddart et al. ("Huddart") is directed to a heated corrugated conduit for use in a respiratory humidification system. Appx1073 (Huddart Abstract). For example, Huddart discloses corrugated tubes with a heater wire inside the tube, as shown below in Figs. 1 and 3. Appx1073, Appx1079, Appx1097. Huddart does not disclose breathable tubes or any breathable material. Appx551-552 (¶¶ 30, 32), Appx775-776.



The Examiner also asserted nonstatutory double patenting rejections of Claims 11, 12, 14-17, 19, 20, and 22 over Claim 7 of U.S. Patent No. 9,802,020 ("Smith '020") in combination with Huddart. Smith '020 Claim 7 depends from Claim 1, both of which are provided below:

> 1. A breathing circuit component comprising:
> a patient end for connecting to a patient interface component,
> a gases-source end comprising a gases-source end connector configured for receiving inspiratory gases and for delivering a bulk flow of expired gases thereto;
> an ***outer conduit, insufficiently sturdy to be self-supporting***, extending from the patient end to the gases-source end;
> ***lateral reinforcement*** configured to support the outer conduit and reinforce the outer conduit against contraction;

*longitudinal reinforcement*, distinct from the lateral reinforcement, configured to support the outer conduit and reinforce the outer conduit against stretching, and

an inner conduit continuously extending within said outer conduit from the patient end to the gases-source end, thereby completely dividing said breathing circuit component into

an inner gases passageway, within said inner conduit, configured to carry the inspiratory gases from the gases-source end connector to a patient and

an outer gases passageway, between said inner conduit and said outer conduit, configured to carry the bulk flow of the expired gases from the patient to the gases-source end connector, the complete division of the outer gases passageway from the inner gases passageway configured to reduce the possibility of rebreathing expiratory gases by the patient during use,

wherein *substantially all of said outer conduit comprises a material that allows the passage of water vapor from said outer gases passageway to ambient* air without allowing the passage of liquid water or the bulk flow of the expired gases, such that the outer conduit reduces relative saturation in the bulk flow of the expired gases to reduce rain out along the outer conduit when in use.

7. The breathing circuit component of claim 1, wherein the *material is a hydrophilic polyester block copolymer*.

Appx1071-1072 (emphasis added).

**D.    Examiner's Double Patenting Rejections**

The Examiner's Final Office Action rejected Claims 1-5, 7, 8, 10-12, 14-17, 19, 20 and 22-31 on the ground of non-statutory double patenting as being unpatentable over Claim 4 of Smith '366 in view of Huddart.  Appx609.

The Examiner asserted a new rejection in the Examiner's Answer. Appx852. In this new rejection, the Examiner rejected Claims 11, 12, 14-17, 19, 20, and 22 on the ground of nonstatutory double patenting as being unpatentable over Claim 7 of Smith '020 in combination with Huddart. *Id.*

### 1.  Rejection Over Smith '366 Claim 4 and Huddart

The Examiner relies on Claim 4, which recites "at least a region of said enclosing wall" being of the hydrophilic polyester block copolymer material in asserting unpatentability of rejected Claim 1. Rejected Claim 1, however, recites that the wall is "formed entirely of a hydrophilic polyester block copolymer material." Acknowledging the difference in scope of Claim 4 of the '366 Patent and the claims in the present Application, the Final Office Action admits that Claim 4 of the '366 Patent "is silent as to explicitly disclosing the wall being formed entirely of the permeable material." Appx613. The Final Office Action does even not allege that Huddart discloses or suggests this limitation. To account for this missing claim limitation, the Final Office Action simply argues: "it would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the … tube/wall to be formed entirely of this permeable material in order to allow for the passage of water vapor out of the tube along any point in the tubes length." Appx613.

Rejected Claims 1 and 11 require corrugations in the expiratory tube, the Examiner relied on Huddart as prior art teaching the use of corrugations in a breathing tube. The Final Office Action states: "…[the device patented in Claim 4 of the '366 Patent] was modified in view of Huddart, not to swap materials, but rather to provide corrugations to the patented tube and to provide end connectors…" Appx618. The Examiner asserts that using corrugations is a well-known feature that provides the known benefit of support while allowing bending. Appx861-862.

### 2. Rejection over Smith '020 Claim 7 and Huddart

The Examiner's Answer provided a new rejection of Claims 11, 12, 14-17, 19, 20, and 22 on the ground of nonstatutory double patenting over Claim 7 of Smith '020 in combination with Huddart. Appx852-855. Smith '020 Claim 7 recites "substantially all of said outer conduit comprises [hydrophilic polyester block copolymer material]." The Examiner disregards the difference between "substantially all" and "entirely," focusing instead on the corrugations limitations. Appx853. According to the Examiner, a POSITA would have modified Claim 7 with Huddart's corrugations to provide support for bending/flexibility and connectivity. *Id*. But this is inconsistent with Smith '020 Claim 7 which requires that the outer conduit be "insufficiently sturdy to be self-supporting."

**E.    The Board's Decision On Appeal**

The Board affirmed all the Examiner's obviousness type, nonstatutory double patenting rejections.  The Board affirmed the Examiner's rejections over Claim 4 of Smith '366 in combination with Huddart, finding it obvious to modify Claim 4 to (1) encompass walls that are "entirely" made of a hydrophilic polyester block copolymer material, and (2) include corrugations.  Appx4-19.

The Board adopted the Examiner's broad construction of Smith '366 Claims 1 and 4 that "at least a region" encompasses the entire wall. Appx10-11. The Board, however, acknowledged that the Examiner's double patenting grounds would require modifying Smith '366 Claim 4 to "exclude walls where only some portion that is less than the entire wall is made of such material."  Appx12.  The Board concluded: "[s]ince this claim is already broad enough to encompass the entire wall, we do not consider narrowing claim 4 to exclude walls with only portions of breathable material as requiring more than ordinary skill." *Id*.

The Board also agreed with the Examiner's conclusion that making a corrugated breathing tube entirely of hydrophilic polyester block copolymer material "is merely a matter of exercising ordinary skill." Appx17.  The Board disregarded Mr. Eaton's declaration testimony that a POSITA would not have had a reasonable expectation of success in adding corrugations to the fragile and weak hydrophilic polyester block copolymer material because the Board disagreed with

Mr. Eaton's definition of a POSITA. Without any evidentiary basis, the Board disagreed with Mr. Eaton's testimony that a POSITA would lack expertise in material science and would have been unfamiliar with the material properties of hydrophilic polyester block copolymer material. Appx13, Appx17.

The Board found that Mr. Eaton's testimony also failed "to consider and balance the respective requirements of enablement under 35 U.S.C. § 112 and obviousness under 35 U.S.C. § 103." Appx14. The Board asserts that a lack of explanation in the specification on how to corrugate hydrophilic polyester block copolymer material suggests that such corrugations were obvious as a matter of exercising ordinary skill. Appx17.

The Board also affirmed the Examiner's new nonstatutory double patenting rejections of Claims 11, 12, 14-17, 19, 20, and 22 over Claim 7 of Smith '020 in combination with Huddart, for "reasons that are essentially identical to those previously expressed with respect to the first ground of rejection[.]" Appx20-21. Without support, the Board asserts that Appellant "presents neither evidence nor persuasive technical reasoning that an enclosing wall that is formed 'exclusively' of hydrophilic polyester block copolymer material is patentably distinct from an enclosing wall 'substantially all' of which is formed from such material." Appx21. But this rejection was newly added in the Examiner's Answer and FPH did present the only evidence of record on this issue.

## IV.  SUMMARY OF THE ARGUMENT

The Board committed legal error by affirming a rejection that confuses domination with double patenting.  Appellant does not dispute that Smith '366 Claim 4 dominates or is a genus of the "entirely" limitation of Claim 1 and the "exclusively" limitation of Claim 11.    But, as the Board acknowledges, domination is not double patenting.  Appx19.  Moreover, it is undisputed that Smith '366 Claim 4 has different claim scope and would need to be modified to address the "entirely" limitation.   Yet the Board and Examiner provided no evidence supporting modification of Claim 4 to address this limitation.   The Board's erroneous conclusions on double patenting are reviewed without deference. *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1352 (Fed. Cir. 2009)

The Board also committed legal error by disregarding the only evidence of record.   The present Application describes many different expiratory tube inventions, some having only a portion (strips) of the tube made of the breathable material and others having a tube wall made entirely of the breathable material. The Board's Decision ignores these different embodiments that have allowed for claims of different scope.  Moreover, Mr. Eaton, an experienced designer of breathing circuits, testified that known hydrophilic polyester block copolymer materials were believed to lack the structural integrity required to allow an

expiratory tube wall to be made entirely of such material.  Appx551-553 (¶¶ 32, 35).  He explained that a POSITA would not have believed an expiratory limb formed entirely of such a breathable material would have been a viable option absent the teachings of the present application.  Appx553 (¶ 32).  Mr. Eaton relied on third-party, near-contemporary patents and evidence that described the difficulty in making an expiratory limb entirely of breathable materials.  Appx552-553 (¶ 33).  Moreover, the cost of the additional material necessary to make the entirety of a tube wall out of such a material would have discouraged a POSITA from even attempting it.  Appx554 (¶ 37).   The Examiner presented no evidence or prior art teachings to rebut Mr. Eaton's declaration evidence.  Thus, the Board committed legal error in disregarding Mr. Eaton's testimony and affirming the Examiner's double patenting rejections.

The Board's conclusions also lack substantial evidence and are contrary to the evidence of record.  The Board found that modifying Smith '366 Claim 4 to require that the tube be formed "entirely" of hydrophilic polyester block copolymer material would have been obvious, without any supporting evidence.  It is undisputed that Smith '366 Claim 4 would need to be modified to address the "entirely" limitation, but the Board and Examiner fail to provide any prior art or other evidence to support modification.  The Board provides nothing more than a conclusory statement that "we do not consider narrowing claim 4 to exclude walls

with only portions of breathable material as requiring more than ordinary skill." Appx11-12.

Regarding the modification to include corrugations, the Board similarly committed legal error in disregarding Mr. Eaton's testimony that a POSITA would have had no reasonable expectation of success in corrugating a hydrophilic block copolymer material, absent the present Application's teachings. Appx553-554 (¶ 36). Mr. Eaton explained that a POSITA would have understood that the thin and delicate nature of breathable materials, including SYMPATEX®, rendered such material too weak for corrugations to be achievable, useful, or meaningful. *Id.* The Board wrongly dismissed Mr. Eaton's testimony, concluding that his proposed level of ordinary skill was incorrect because a POSITA would have expertise in material science. There is no support or explanation for a POSITA having such a heightened level of expertise in material science. The Board's failure to consider Mr. Eaton's testimony is arbitrary and capricious and not supported by substantial evidence.

The Board also committed legal error in affirming the new rejection based on Smith '020 Claim 7. The Board erred by construing "substantially all" to be the same as "exclusively". The prior Claim 7 explicitly requires a wall with longitudinal and lateral reinforcements made of different materials, confirming that "substantially all" cannot be equivalent to "exclusively." The "exclusively"

limitation of the rejected claims is entirely different from "substantially all" in Claim 7, which undermines the Board's construction. The Board's failure to consider the unrebutted evidence that the claims are patentably distinct was arbitrary and legal error. Thus, the Board's Decision requires reversal.

## V. <u>ARGUMENT</u>

### A. <u>Standard of Review and Legal Standards</u>

Obviousness-type double patenting is a question of law that the Federal Circuit reviews *de novo*. *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (citing *In re Emert*, 124 F.3d 1458, 1460 (Fed Cir. 1997)). The Federal Circuit "review[s] a court's conclusion on double patenting without deference because 'double patenting is a matter of what is claimed, and therefore is treated like claim construction upon appellate review.'" *Amgen*, 580 F.3d at 1352 (quoting *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1326 (Fed Cir. 1999)). "A rejection under the doctrine of double-patenting is a legal conclusion to which this court gives complete and independent review." *In re Emert*, 124 F.3dat 1460 *(citing In re Goodman,* 11 F.3d 1046, 1052 (Fed. Cir. 1993); *In re Vogel,* 422 F.2d 438, 441 (1970)). The Federal Circuit "review[s] the Board's factual findings[,]" such as the level of ordinary skill in the prior art, "for substantial evidence." *Hubbell*, 709 F.3d at 1145 (citing *In re Gartside*, 203 F.3d 1305, 1316 (Fed Cir. 2000)).

An obviousness-type double patenting analysis consists of two steps. "First, the court 'construes the claim[s] in the earlier patent and the claim[s] in the later patent and determines the differences.' Second, the court 'determines whether those differences render the claims patentably distinct.'" *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1385 (Fed. Cir. 2010) (alteration in original) (quoting *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008)).

The PTAB's failure to address arguments, evidence and factual findings are reviewed under the Administrative Procedures Act, 5 U.S.C. § 706. *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999).   Under the APA, this Court sets aside any agency decision that is "arbitrary" or "capricious" or "unsupported by substantial evidence." *Id.* (quoting 5 U.S.C. § 706).   The PTAB's overlooking the actual record evidence contrary to obviousness is arbitrary and capricious.  *Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*, 701 F. App'x 942, 945 (Fed. Cir. 2017). *See also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem").   Moreover, "a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015). *See also Knowles Elecs. LLC v. Iancu*, 886 F.3d 1369, 1384 (Fed. Cir. 2018) (applying this

rule to review of PTO decisions).  Thus, this Court may not affirm the PTAB's

arbitrary and capricious decision on alternative grounds not considered by the

PTAB.

**B.**    **The Board Erred In Affirming The Rejection Based On Claim 4 Of Smith '366**

**1.**    **It is undisputed that the prior issued Claim 4 would require modification to address the "entirely" limitation**

Smith '366 Claim 4 recites that "at least a portion" of the enclosing wall is

made of breathable material, whereas the rejected claims require that wall to be

made "entirely/exclusively" of such a material.  There is no dispute that the prior

Claim 4 and the rejected claims have different claim scope with respect to this

limitation.  The Board and the Examiner admit that Smith Claim 4 would require

modification to arrive at the rejected claims' tube formed entirely/exclusively of

the specified material.  Appx11-12.  For example, the Decision acknowledges that

the Examiner's rejection is "**modifying** claim 4 to exclude walls where only some

portion that is less than the entire wall is made of such material."  Appx11-12

(emphasis added).  The rejection in the Final Office Action asserted that it would

have been obvious "to **modify** the … tube/wall to be formed entirely of this

permeable material in order to allow for the passage of water vapor out of the tube

along any point in the tubes length."  Appx610 (emphasis added).  Although they

identified this necessary modification, the Board and Examiner did not identify

any prior art reference that suggests or supports this modification.  They failed to provide any evidence to support modifying the claim in this manner.

### 2. The Rejection Confused Domination With Double Patenting

Domination and double patenting are two separate legal concepts.  *In re Kaplan*, 789 F.2d 1574, 1577-78 (Fed. Cir. 1986).  The Board committed reversible legal error by affirming rejections that confused the domination doctrine with double patenting.  *Id.*

#### a. The Board's analysis merely establishes domination, not double patenting

In this rejection, the Examiner asserts that because Claims 1 and 4 of Smith '366 may broadly encompass the subject matter of the currently appealed claims, a double patenting rejection is warranted.  Appx860, Appx863.  The Board agreed with the Examiner's broad interpretation of Claims 1 and 4, concluding that the broader claims *alone* render the "entirely/exclusively" limitations obvious due to their domination of those claims.  Appx11-12.  Huddart, the only other prior art cited by the Examiner, fails to disclose anything about a wall being made of breathable material and was not relied on for the "entirely/exclusively" claim limitations.  The Examiner's reasoning confuses the concepts of domination and double patenting and is contrary to well established law.  One patent or application "dominates" a second patent or application when the first patent or application has

a broad or generic claim which fully encompasses or reads on an invention defined in a narrower or more specific claim in another patent or application. *In re Kaplan*, 789 F.2d at 1577-78; *In re Sarett*, 327 F.2d 1005, 1014-15 (CCPA 1964). Domination by itself, i.e., in the absence of statutory or nonstatutory double patenting grounds, cannot support a double patenting rejection. *Id*.

The Board also overlooked the case law which establishes that "the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006); *Ex Parte J. Marc Simard & Mingkui Chen*, No. 2017-007262, 2019 WL 1125741, at *3 (P.T.A.B. Feb. 13, 2019).

The use of "at least a region" of an expiratory tube wall being made of a hydrophilic polyester block copolymer may be a genus of and dominant to a narrower claim to a wall being made entirely of that same material, but it is not sufficient evidence on which to base a double patenting claim. Rather the Examiner must show the claims are ***patentably indistinct*** variations of the same claim. *In re Van Ornum,* 686 F.2d 937, 944-48 (CCPA 1982). Although not every species of a patented genus is separately patentable, obviousness is not demonstrated merely by showing that the earlier patent dominates the later claims. *AbbVie, Inc. v. Kennedy Inst. of Rheumatology Trust*, 764 F.3d 1366, 1379 (Fed Cir. 2014). Instead of showing that the claims are patentably indistinct, the Board

and the Examiner admit that Smith Claim 4 would require modification to arrive at the rejected claims' "entirely/exclusively" limitations, which undermines any position that the claims are patentably indistinct.  Appx11-12.

As explained herein and in FPH's briefing before the Board, the Examiner has failed to show that the rejected claims are patentably indistinct and has dismissed Appellant's unrebutted evidence related to determining the level of ordinary skill in the art and nonobviousness.  Instead, the Examiner argues that the Smith '366 claims alone encompass and render obvious the "entirely/exclusively" limitations of the present claims, which is an improper domination argument.

### b.    FPH's domination argument was timely and proper

The Board's Decision did not consider FPH's arguments regarding domination because the Board incorrectly concluded that the arguments were untimely.  Appx18.  FPH's arguments regarding domination were a continuation of the arguments in the Appeal Brief and are responsive to arguments raised in the Examiner's Answer.  *See* Appx773-778, Appx860-861.  As explained in FPH's Reply, the domination arguments respond to the Examiner's arguments that because Claims 1 and 4 of the '366 patent are dominant to and may broadly encompass the subject matter of the currently appealed claims, a double patenting rejection is warranted.  App869.  Specifically, the Examiner argued that "at least

a region' is a range whose upper end would include the entirety of the wall." Appx860. In response to these Examiner arguments, Appellant provided additional explanation for how the Examiner was improperly confusing the concepts of domination and double patenting contrary to well established law. Appx869-870. Appellant's domination arguments were directly responsive to the Examiner's arguments regarding the relative claim scope.

Appellant's domination arguments are also a continuation of arguments made during prosecution in response to the Examiner's office actions. Appx575-578. For example, Appellant explained to the Examiner that it was improper for this rejection to rely solely on Claims 1 and 4 of the '366 patent for the "entirely" limitation because those claims and the prior art fail to disclose the wall being formed entirely of permeable material. Appx575-576. Thus, Appellant argued that the Examiner could not rely on the prior claims alone for this limitation, even if those claims broadly encompass the "entirely" limitation. Appx575-576.

### 3.    The Board Committed Legal Error By Disregarding Mr. Eaton's Unrebutted Testimony

The Board acknowledges that the prior issued claim (Smith '366 Claim 4) relied on for its double patenting rejection must be modified to render the rejected claims unpatentable. Appx11-12. But the Board's proposed modifications are

not supported by evidence and disregard unrebutted evidence showing non-obviousness for two different limitations.

The prior issued claim does not recite the relevant limitations (1) being made entirely of breathable material and (2) corrugations in the breathable material. Huddart, the only secondary reference relied on by the Examiner, is silent as to any breathable material at all and fails to support the proposed modifications. FPH submitted a declaration of independent expert Jason Eaton, an engineer with experience in designing respiratory interfaces and circuits. Mr. Eaton's declaration provided the only evidence of record regarding the Examiner's proposed obviousness modifications. As explained further below, Mr. Eaton's declaration explains why the proposed modifications would not have been obvious for multiple reasons. The Examiner and Board improperly disregarded this declaration evidence, concluding that "we are not inclined to accord it much weight" without providing any counter evidence or a reason why Mr. Eaton's opinions should not be given much weight.

### a. Mr. Eaton's Level of Ordinary Skill in the Art

The Board committed legal error in dismissing Mr. Eaton's evidence, concluding that the level of ordinary skill he provided was incorrect. Appx12-13. The Decision provides the various factors for determining the level of ordinary skill and concludes that "[i]t does not appear that Mr. Eaton did a comprehensive

analysis of skill level" using these factors. *Id.* This conclusion is arbitrary and disregards the evidence of record. For example, Mr. Eaton's declaration explains that he considered the proper factors informing the level of skill and used his experience in the relevant field of breathing circuits to determine the appropriate level of skill. Appx547-548 (¶¶ 22-25).

Rather than explain how Mr. Eaton may have failed to perform a comprehensive analysis using the *Environment Design* factors, the Board disagrees with Mr. Eaton regarding whether a POSITA in the field of breathing circuits design would have material science expertise. Appx13-14. The Decision attacks Mr. Eaton's ***testimony*** that such a POSITA would not possess material science expertise and would need to rely on expertise of material scientist, chemists, researchers, and manufacturers of raw materials for guidance regarding material properties. *Id.* The Board's basis for this attack is that such testimony "does not comport with applicable law" because the POSITA is someone who is "well positioned within the applicable field of technology." *Id.* The Board admits, however, that breathing circuits and breathable materials are distinct arts, suggesting that the POSITA in breathing circuits may not possess material science expertise. Appx14.

The Decision and Examiner have provided no evidence that the relevant POSITA of breathing circuits would have expertise in material science. There is

no case law to support this idea that a POSITA would have ***expertise*** in the relevant field, much less expertise in a ***different*** art or technology. Moreover, Mr. Eaton has experience as a POSITA in the field of breathing circuits and has firsthand knowledge of experience and expertise of such a POSITA. Appx547-548 (¶¶ 23-24). Mr. Eaton's testimony is the only evidence of record regarding the skill and knowledge of a POSITA and he has established himself as an expert in breathing circuit design. *Id*. The Board committed legal error in rejecting Mr. Eaton's level of ordinary skill without any contrary evidence and by assuming (incorrectly) that a POSITA would have expertise in a different field such as material science.

The Decision also disagrees with Mr. Eaton's testimony that a person of ordinary skill would have been unfamiliar with the material properties of hydrophilic polyester block copolymer material. Appx17. There is no evidence indicating the *extent* to which materials like SYMPATEX® were commercially available at the time of the invention. But even though such materials were commercially available, a person of skill would not necessarily be familiar with the material properties of *all* available materials. The *In re Jacoby* case cited in the Decision does not support the proposition that a POSITA would know all commercially available materials. 309 F.2d 513, 516 (CCPA 1962). Rather, this case suggests that a person of skill in a certain field would know more about the

field than what the specific prior art references disclose.  *Id*.  Mr. Eaton provided the only evidence on this level of ordinary skill issue and it was wrongly overlooked in the Decision.

### b.    Mr. Eaton Did Not Fail to Consider Enablement

The Board committed legal error in concluding that Mr. Eaton's testimony fails to consider and balance the requirements of enablement and obviousness. Appx14-15.  The Board's apparent lack of enablement assertion is not a rejection raised by the examiner and was not briefed or argued before the Board's errant decision.

According to the Board, if a POSITA is capable of making and using the invention of claim 1 without undue experimentation, that "same person brings an equivalent degree of skill to the obviousness analysis."  *Id*.  The Board's argument, however, fails to take into account an important distinction, namely that for enablement the POSITA would have access to the specification of the present application.   In contrast, a POSITA would not have access to the specification in the obviousness analysis, only the earlier claim and the prior art. Mr. Eaton referenced this distinction when he qualified his opinion with the phrase "absent the teachings of the present application."  Appx552 (¶ 32).  Thus, although the POSITA might be the same for both enablement and obviousness,

the obviousness analysis excludes access to the present application which describes the claimed invention.

The Board's decision does not address the disclosure of processes and embodiments disclosed in the present application that provide tubes and limbs made entirely of breathable materials such as hydrophilic polyester block copolymer materials and teaches the use of corrugations. Rather, the Board appears to take issue with the specificity provided in the Specification with regards to corrugating hydrophilic polyester block copolymer material. Appx16.

### c.     Mr. Eaton's evidence of cost considerations is relevant to obviousness

The Board committed legal error in overlooking Appellant's evidence that a person of skill in the art would have been discouraged from making the claimed tube due to the cost of the material. Appx554 (¶ 37). Mr. Eaton provided evidence that breathable polymers were extremely expensive at the time of the invention. *Id*. He explained that these materials were expensive when compared to typical plastics and the increased material cost would have discouraged a person of skill from forming the conduit "entirely from hydrophilic polyester block copolymer in a sufficient thickness to work as an expiratory limb at the time of the invention." *Id*. This is also confirmed in the present '557 specification at paragraph [0034]. The Board dismissed this evidence as mere economic reasons, citing the *In re*

*Farrenkopf* decision regarding what a businessmen would or would not do. 713 F.2d 714 (Fed. Cir. 1983). But Mr. Eaton's testimony is from the perspective of a person of skill in the art and the case law does not suggest that high cost is irrelevant to the obviousness motivation analysis. As explained by Mr. Eaton, a person of skill would have considered the difficulty and the cost in designing a breathing tube.

**4.    The Board Erred in Affirming a Rejection That Is Unsupported and Contrary to the Evidence**

### a. The Board's material modification to Smith '366 Claim 4 is unsupported and disregards the evidence

The Board affirmed the Examiner's nonstatutory double patenting rejection of the present claims based on a modification of Claim 4 of Smith '366. In the rejected claims, the breathing tubes or limbs have walls that are formed "entirely," "exclusively," or "consisting essentially" of a hydrophilic polyester block copolymer. In contrast to the entirely/exclusively limitation of the rejected claims, the claim relied on by the Examiner (Claim 4 of Smith '366) recites "at least a portion" of the enclosing wall is made of the breathable material. This change in the claims is significant, not only because it covers a separately disclosed embodiment, but also because it represents a significant engineering change not previously thought possible. The Board and the Examiner admit that Smith Claim 4 would require modification to arrive at the rejected claims' tube

formed entirely/exclusively of the specified material.  For example, the Decision acknowledges that the Examiner's rejection is "***modifying*** claim 4 to exclude walls where only some portion that is less than the entire wall is made of such material." Appx11-12 (emphasis added).   Although they identified a necessary modification, the Board and Examiner failed to provide evidence to support modifying the claim in this manner.  Thus, the Board's affirmance of this rejection is arbitrary and lacks substantial evidence.

Instead of identifying evidence or case law to support this modification, the Examiner argued that a POSITA would have reasoned that providing a greater region of permeability would provide more passage of water vapor and more permeability.  Appx857.  No evidence or prior art support this conjecture and it is contradicted by the evidence of record.  The Board's Decision merely states "[s]ince the claim is already broad enough to encompass the entire wall, we do not consider narrowing claim 4 to exclude walls with only portions of breathable material as requiring more than ordinary skill."  Appx12.  At best this is an assertion of dominance which does not satisfy the obviousness standard, as discussed in Section V.C below.  The Board's statements are conclusory and fail to address whether a POSITA would have a reasonable expectation of success in modifying Claim 4 to exclude walls where only some portion that is less than the entire wall is made of the specified material.  Such a tube is not claimed in Claim

4 and is not disclosed or suggested in the prior art. The only prior art reference relied on for the rejection is Huddart which fails to disclose any breathable material, let alone breathable material forming the entirety of a tube. Because the Examiner's modification is not based on prior art or other evidence, it cannot sustain a rejection and should be reversed. *In re Kaplan*, 789 F.2d at 1580 (reversing a double patenting rejection because of lack of evidence of obviousness based on prior art).

Not only is the Examiner's modification of Smith '366 Claim 4 unsupported by any evidence, but it is also contrary to the only evidence of record – evidence the Decision failed to properly consider. As explained in Petitioner's Appeal Brief and confirmed by Mr. Eaton and contemporary prior art statements, prior to Applicant's invention and specification disclosure, known hydrophilic polyester block copolymer materials exhibiting diffusion properties were believed to lack the structural integrity required to allow the expiratory limb wall to be made entirely of breathable material. Appx551-554 (¶¶ 32-37). As explained by Mr. Eaton, the knowledge that at least a portion of a tube wall can be made a certain breathable material does not provide a teaching or suggestion that a tube wall made entirely of the breathable material was believed possible. Appx551-554 (¶¶ 31-37). Mr. Eaton further explained that "one of skill in the art at the time of the invention would ***not*** have believed an expiratory limb formed entirely of

breathable material would have been a viable option absent the teachings of the present application." Appx551 (¶ 32) (emphasis added).  According to Mr. Eaton, the known hydrophilic polyester block copolymer materials exhibiting diffusion properties were understood to lack sufficient structural integrity such that a person of skill **would not have believed** it was possible to construct an entirety of the tube wall out of a hydrophilic polyester block copolymer because it was too fragile. Appx551-553 (¶¶ 31-35).  In addition to Mr. Eaton's extensive experience, Mr. Eaton's testimony is confirmed by a third-party Perma Pure Patent (U.S. Patent No. 6,779,522 at 2:33-65) which is not prior art, but is nearly contemporaneous with the priority date of present Application and explains the difficulty in making an expiratory limb entirely of breathable materials.  Appx552 (¶ 33).  The Perma Pure Patent confirms that making breathing tubes entirely of NAFION® and other breathable materials was thought to be "impractical."  *Id*.  The Perma Pure Patent arrived at a structure that was only partially made of breathable materials, confirming Mr. Eaton's testimony of non-obviousness.

Moreover, Mr. Eaton also explained and provided evidence that the cost of the additional breathable material necessary to make the entirety of a tube wall of breathable material would have discouraged a person of skill from even attempting it.  Appx552 (¶ 37).  This evidence of contrary accepted wisdom **is** evidence of nonobviousness.  *See In re Hedges*, 783 F.2d 1038 (Fed. Cir. 1986).  The Examiner

presented no evidence or prior art teachings that contradict Mr. Eaton's declaration evidence.

The specification of the present Application provides multiple different inventions. Some of the inventions relate to an expiratory limb where at least a portion of the tube wall is made of the breathable material but other portions are not. *See e.g.,* Appx49 ([0025] and [0030]) and Appx83 ([0077]). Other inventions describe a tube wall made entirely of the breathable material. *Id.* Thus, the prior issued claim and the rejected claims are directed to entirely different embodiments. The Board's Decision failed to properly consider the different embodiments disclosed in the present Application. This is legal error and undermines the double patenting conclusion, especially where the compared claims are directed to different embodiments from the disclosure of the Application.

Regarding Mr. Eaton's declaration testimony, the Board stated "we are not inclined to accord it much weight in our analysis." Appx12. The Board provided no analysis for why it believed it was accorded little weight. But this statement suggests that the Board is giving Mr. Eaton's testimony at least some weight. Because the Board and Examiner failed to identify any evidence supporting the proposed modification, Mr. Eaton's testimony would tip the scales toward nonobviousness, even if accorded very little weight. Moreover, the Board's reasons

for disregarding Mr. Eaton's testimony are improper and unsupported, as explained in Section VII.B.3 below.

### b.    The Board's Corrugation Modification is Unsupported and Disregards the Evidence

Rejected claims 1 and 11 additionally require corrugations in the tube made entirely of the hydrophilic polyester block copolymer material.  Claim 4 of the '366 Patent does not recite corrugations.  Instead, the Examiner relied on Huddart as teaching corrugations with non-breathable materials.  Appx861-862.  The Board's Decision agreed with the Examiner's conclusion that making a corrugated breathing tube entirely of hydrophilic polyester block copolymer material "is merely a matter of exercising ordinary skill."  Appx17.  The Examiner and Board, however, provided no evidence to support this conclusion which overlooked the contrary testimony of Mr. Eaton.

The Board's decision merely repeats the Examiner's argument that using corrugations is a "well-known feature that provides the known benefit of support while allowing bending."  Appx12.  Neither Claim 4 nor Huddart, however, disclose corrugations in a breathable material such as a hydrophilic polyester block copolymer.  The Board asserts that corrugations would be beneficial but fails to identify anything in Claim 4 or Huddart suggesting that such a corrugated tube could be made.  FPH provided the only evidence related to expectation of

-34-

success in creating a corrugated tube entirely of hydrophilic polyester block copolymer material—evidence that the Board disregarded.

FPH presented evidence showing that at the time of the invention, a person of skill would have had no reasonable expectation of success in corrugating a hydrophilic block copolymer material, absent the present Specification's teachings. Appx553-554 (¶ 36). For example, Mr. Eaton explained that at the time of the invention, "one of skill would have understood that the thin and delicate nature of breathable materials, including SYMPATEX®, rendered such material too thin, fragile and weak for corrugations to be achievable, useful, or meaningful." *Id*. He further explained that a person of skill would have had "no reasonable expectation of success in corrugating a hydrophilic block copolymer material because the material would have been expected to simply flatten out almost immediately and have insufficient structural strength to maintain any corrugations." *Id*. Mr. Eaton provided additional reasons for why a person of skill would not have attempted to add corrugations to a wall made of the breathable material, for example, because a breathing tube made of a thin film with corrugations would expand longitudinally when increased pressure was applied internally, resulting in undesired movement and changing of the passageway volume by lengthening or extending the expiratory limb wall. *Id*. Thus, absent the disclosure in the present Specification explaining to a POSITA

that it was possible, a POSITA would not have considered corrugating the breathable material, or they would have assumed it would fail and quickly dismissed the idea.

The Examiner and Board's Decision disregarded Mr. Eaton's declaration, stating that "we are not inclined to accord it much weight." Appx12. But even this conclusion acknowledges that Mr. Eaton's evidence has some weight, and the Board and Examiner failed to provide anything to rebut the evidence. *Id*. Instead, the Board overlooked the only relevant evidence based on improper reasoning.

## C. **The Board Erred In Affirming The New Rejection Based On Claim 7 Of Smith '020**

The Examiner's Answer rejected Claims 11-12, 14-17, 19-20 and 22 on the new ground of nonstatutory double patenting over Claim 7 of Smith '020 in view of Huddart. The Board committed legal error by construing "substantially all" from the prior claim to mean "exclusively." A POSITA would have understood that Claim 7 of Smith '020 is directed to a different invention that does not render the rejected claims obvious, with or without Huddart.

Claim 11 of the present application recites a flexible enclosing wall defining a gases flow passageway formed ***exclusively*** of a hydrophilic polyester block copolymer material. In contrast, Claim 7 of Smith '020 expressly claims a material that is "insufficiently sturdy to be self-supporting" and requires separate

lateral and longitudinal reinforcements which form part of the enclosing wall. Claim 7 is directed to a coaxial dual limb breathing circuit with a very different arrangement that includes "an inner conduit continuously extending within said outer conduit from the patient end to the gases-source end." Thus, Claim 7 is patentably distinct from Claim 11 at least because Claim 7's conduit wall is expressly ***not*** formed exclusively of a hydrophilic polyester block copolymer material. The specification of the present application describes the longitudinal and lateral reinforcements as being made of different non-breathable materials. Appx52 ([0039]), Appx83 ([0077]). Thus, the phrase "substantially all" in Claim 7 of Smith '020 must be construed to allow for multiple materials in the enclosing wall. Claim 7 cannot be interpreted as claiming an enclosing wall formed "exclusively" of a hydrophilic polyester block copolymer material. The Board misapprehended and/or overlooked this fact, concluding that Appellant failed to provide evidence that the rejected claims requiring "exclusively" are patentably distinct from Claim 7. Appx21.

The Board's Decision did not address the fact that Claim 7 of Smith '020 explicitly claims an enclosing wall that includes longitudinal and lateral reinforcements made of materials different from the hydrophilic polyester block copolymer. Instead, the Board focused on the "substantially all" language from Claim 1 of Smith '020, suggesting that "substantially all" is somehow equivalent

to "exclusively." Appx21. A person of skill would have understood that "substantially all" is distinct from "exclusively," especially where the claim including "substantially all" explicitly includes other different materials. The Examiner and Board have not provided any explanation or evidence for why the multi-material wall of Smith '020 would render obvious the presently claimed wall that is made "exclusively" of a single material. The only evidence provided on this issue confirms that "exclusively" in the rejected claims is entirely different from "substantially all" in Claim 7 which allows for additional structure and different material.

A POSITA reading the present application would understand the rejected claims as describing an invention that is patentably distinct from Claim 7 of the '020 patent. The Board incorrectly concludes that Appellant has presented no evidence or reasoning that a wall formed "exclusively" of hydrophilic polyester block copolymer material is patentably distinct from an enclosing wall "substantially all" of which is formed from such material, overlooking evidence and reasoning based on the explicit claim language and the specification. For example, the Decision did not address the fact that the Specification describes a separate "variations" of Fig. 6 in which reinforcements can be used to provide support. Appx49 ([0030]). Similarly, in other sections, the Specification explains: "Preferably the outer conduit 456 is formed entirely from breathable

material, ***and may also*** include lateral reinforcement … and longitudinal reinforcement…" Appx83 (*Id.* at [0077]).  The words "may also" indicate an optional addition leading to a separate embodiment.  Once the reinforcements, formed of a different material, are added, the conduit wall is no longer "exclusively" made of a breathable material.  The ordinary meaning of "exclusively" would prohibit separate reinforcement members because it would no longer be exclusive as claimed, but rather would include other materials.  Interpreting "exclusively" as allowing for other materials would render the word meaningless in this context.

Claim 7 of the '020 also fails to recite corrugations formed in the hydrophilic polyester block copolymer material.  In fact, Claim 7 expressly claims a material that is "insufficiently sturdy to be self-supporting," which would exclude self-supporting corrugations.  The new ground of rejection relies on the same Huddart reference for this feature.  Huddart teaches corrugations in a non-breathable material.  Huddart does not provide any teachings of an expiratory tube wall "exclusively" of a hydrophilic polyester block copolymer material.  Accordingly, it does not provide the missing teachings claimed by the presently appealed Claim 11.  Moreover, for the same reasons discussed in FPH's Appeal Brief, and as evidenced by the declaration of Jason Eaton, a person of skill, absent the present Specification, would not have believed at the time of the invention that

corrugations could be formed in the then known hydrophilic polyester block copolymer material with the other necessary attributes as claimed. As explained above, Claim 7 of Smith '020 already includes support structures that support the wall material. The Examiner and the Decision fail to provide any evidence that a POSITA could or would remove the support structures of Claim 7 and replace the entire enclosing wall with a different wall that has corrugations. As explained above, the Decision failed to give weight to the unrebutted Eaton testimony that a POSITA would not have been motivated to attempt corrugations in a tube made exclusively of hydrophilic polyester block copolymer.

## VI. CONCLUSION

The Board's final decision holding claims 1-5, 7, 8, 10-12, 14-17, 19, 20 and 22-31 unpatentable lacks support and is contrary to the evidence of record. The Board arbitrarily and capriciously disregarded the only evidence of record. The decision with respect to all pending claims should be reversed.

KNOBBE, MARTENS, OLSON & BEAR, LLP

August 14, 2023          /s/ *Benjamin J. Everton*
                         Benjamin J. Everton

                         *Attorneys for Appellant*
                         FISHER & PAYKEL HEALTHCARE LIMITED

## APPENDIX OF CLAIMS

1. An expiratory tube comprising:

    a first end connector terminating a first end of the expiratory tube, wherein the first end connector is configured to connect to a ventilator;

    a second end connector terminating a second end of the expiratory tube, wherein the second end connector is configured to connect to a patient interface component; and

    a flexible enclosing wall defining a single gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible enclosing wall including corrugations and formed entirely of a hydrophilic polyester block copolymer material, wherein the flexible enclosing wall separates the single gases flow passageway from ambient air, the corrugated hydrophilic polyester block copolymer material configured to reduce humidity of gases in the single gases flow passageway by diffusion from the single gases flow passageway through the flexible enclosing wall directly to ambient air;

    wherein the expiratory tube forms an expiratory limb of a breathing circuit.

2. The expiratory tube of Claim 1, further comprising a heater structure located within at least one of the single gases flow passageway or the flexible

enclosing wall, the heater structure comprising a heater wire, wherein the heater structure runs at least a portion of a length of the expiratory tube.

3.    The expiratory tube of Claim 1, wherein the expiratory tube is configured to reduce condensation within the single gases flow passageway.

4.    The expiratory tube of Claim 1, wherein the expiratory tube is formed as a single continuous uniform tube between the first end connector and the second end connector.

5.    The expiratory tube of Claim 4, wherein the flexible enclosing wall is extruded.

6.    (Cancelled)

7.    The expiratory tube of Claim 1, wherein the expiratory tube does not include collection points for draining condensed liquid from the expiratory tube.

8.    The expiratory tube of Claim 1, wherein the expiratory tube is configured to reduce humidity of gases flowing through the single gases flow passageway due to a difference in relative partial pressures of water vapor between an interior of the single gases flow passageway and ambient conditions outside of the flexible enclosing wall.

9.    (Cancelled)

10.    The expiratory tube of Claim 2, wherein the heater wire is arranged in a helical configuration.

11.    An expiratory tube comprising:

a first end connector terminating a first end of the expiratory tube;

a second end connector terminating a second end of the expiratory tube; and

a flexible enclosing wall defining a gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible enclosing wall including corrugations and formed exclusively of a hydrophilic polyester block copolymer material that is configured to reduce humidity of gases in the gases flow passageway through diffusion directly to ambient air;

wherein the expiratory tube forms an expiratory limb of a breathing circuit.

12.    The expiratory tube of Claim 11, wherein the expiratory tube is configured to reduce condensation within the gases flow passageway.

13.    (Cancelled)

14.    The expiratory tube of Claim 11, wherein the flexible enclosing wall is extruded.

15.    The expiratory tube of Claim 11, wherein the expiratory tube is formed as a single continuous uniform tube between the first end connector and the second end connector.

16.    The expiratory tube of Claim 11, wherein the first end connector is configured to connect to a ventilator.

17.    The expiratory tube of Claim 11, wherein the second end connector is configured to connect to a patient interface component.

18.    (Cancelled)

19.    The expiratory tube of Claim 11, wherein the expiratory tube does not include collection points for draining condensed liquid from the expiratory tube.

20.    The expiratory tube of Claim 11, wherein the flexible enclosing wall reduces the humidity within the expiratory tube due to a difference in relative partial pressures of water vapor between an interior of the gases flow passageway and ambient conditions outside of the flexible enclosing wall.

21.    (Cancelled)

22.    The expiratory tube of Claim11, wherein the expiratory tube further comprises a helical heater wire.

23.    An expiratory limb comprising:

a first end connector terminating a first end of the expiratory limb;

a second end connector terminating a second end of the expiratory limb; and

a flexible tubular portion defining a single gases flow passageway connecting the first end connector and the second end connector, the flexible tubular portion consisting essentially of a hydrophilic polyester block copolymer material, wherein the flexible tubular portion separates the single gases flow passageway from ambient air along an entire length of the flexible tubular portion, the hydrophilic polyester block copolymer material configured to reduce humidity of gases in the single gases flow passageway through diffusion from the single gases flow passageway through the flexible tubular portion directly to ambient air;

wherein the expiratory limb forms part of a breathing circuit.

24.    The expiratory limb of Claim 23, wherein the flexible tubular portion is corrugated.

25.    The expiratory limb of Claim 23, further comprising a heater structure located within at least one of the single gases flow passageway or the flexible tubular portion, the heater structure comprising a heater wire, wherein the heater structure runs at least a portion of a length of the expiratory limb.

26.    The expiratory limb of Claim 25, wherein the heater wire is arranged in a helical configuration.

27.    The expiratory limb of Claim 23, wherein the flexible tubular portion is configured to reduce condensation within the single gases flow passageway.

28.    The expiratory limb of Claim 23, wherein the flexible tubular portion is formed as a single continuous uniform material between the first end connector and the second end connector.

29.    The expiratory limb of Claim 27, wherein the flexible tubular portion is formed by extrusion.

30.    The expiratory limb of Claim 23, wherein the flexible tubular portion does not include collection points for draining condensed liquid.

31.    The expiratory limb of Claim 23, wherein the flexible tubular portion is configured to reduce the humidity of gases flowing through the single gases flow passageway due to a difference in relative partial pressures of water vapor between an interior of the single gases flow passageway and ambient conditions outside of the flexible tubular portion.

# INDEX OF APPENDED MATERIAL

- Patent Board Decision dated October 5, 2022 (Appx1-21)

- Specification as amended pursuant to Fed. Cir. R. 28(c)(1)(B) (Appx45-64, Appx83-84, Appx101, Appx384-385)

- Figures as amended pursuant to Fed. Cir. R. 28(c)(1)(B) (Appx67-75, Appx88, Appx365)

- Claims as amended pursuant to Fed. Cir. R. 28(c)(1)(B) (Appx 761-764);

# ADDENDUM

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/633,557 | 06/26/2017 | Daniel John Smith | FPHCR.052D1 | 8382 |

165988        7590        10/05/2022
Knobbe, Martens, Olson & Bear, LLP (FPHCR)
FISHER & PAYKEL HEALTHCARE LIMITED
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| STUART, COLIN W |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3785 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/05/2022 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

admin.ip@fphcare.co.nz
efiling@knobbe.com
jayna.cartee@knobbe.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

*Ex parte* DANIEL JOHN SMITH, GAVIN WALSH MILLAR,
KEVIN BLAKE POWELL, and DAVID PETER BALDWIN

———————————

Appeal 2021-004502
Application 15/633,557
Technology Center 3700

———————————

Before JENNIFER D. BAHR, WILLIAM A. CAPP, and
LISA M. GUIJT, *Administrative Patent Judges.*

CAPP, *Administrative Patent Judge.*

DECISION ON APPEAL

STATEMENT OF THE CASE

Appellant[1] seeks our review under 35 U.S.C. § 134(a) of the final
rejection of claims 1–5, 7, 8, 10–12, 14–17, 19, 20, and 22–31. We have
jurisdiction under 35 U.S.C. § 6(b).[2]

We AFFIRM.

———————————

[1] We use the word "Appellant" to refer to "applicant" as defined in 37
C.F.R. § 1.42(a). Appellant identifies Fisher & Paykel Healthcare
Limited as the applicant and real party in interest. Appeal Br. 2.

[2] This case came before the Board for regularly scheduled oral hearing on
September 26, 2022.

Appeal 2021-004502
Application 15/633,557

## THE INVENTION

Appellant's invention relates to respiratory devices.  Spec. ¶ 2.

Claim 1, reproduced below, is illustrative of the subject matter on appeal.

> 1.  An expiratory tube comprising:
> a first end connector terminating a first end of the expiratory tube, wherein the first end connector is configured to connect to a ventilator;
> a second end connector terminating a second end of the expiratory tube, wherein the second end connector is configured to connect to a patient interface component; and
> a flexible enclosing wall defining a single gases flow passageway of the expiratory tube between the first end connector and the second end connector,
> the flexible enclosing wall including corrugations and formed entirely of a hydrophilic polyester block copolymer material,
> wherein the flexible enclosing wall separates the single gases flow passageway from ambient air,
> the corrugated hydrophilic polyester block copolymer material configured to reduce humidity of gases in the single gases flow passageway by diffusion from the single gases flow passageway through the flexible enclosing wall directly to ambient air;
> wherein the expiratory tube forms an expiratory limb of a breathing circuit.

## THE REJECTIONS

The Examiner relies upon the following as evidence in support of the rejections:

| NAME | REFERENCE | DATE |
|------|-----------|------|
| Smith '366 | US 7,140,366 B2 | Nov. 28, 2006 |
| Smith '020 | US 9,802,020 B2 | Oct. 31, 2017 |
| Huddart | WO 97/18001 | May 22, 1997 |

2

**Appx3**

Appeal 2021-004502
Application 15/633,557

The following rejections are before us for review:

1. Claims 1–5, 7, 8, 10–12, 14–17, 19, 20, and 22–31 are rejected under the doctrine of obviousness type, nonstatutory double patenting over claim 4 of Smith '366 in combination with Huddart.

2. Claims 11, 12, 14–17, 19, 20, and 22 are rejected under the doctrine of obviousness type, nonstatutory double patenting over claim 7 of Smith '020 in combination with Huddart.[3]

OPINION

*Obviousness Type, Nonstatutory Double Patenting of*
*Claims 1–5, 7, 8, 10–12, 14–17, 19, 20, and 22–31 over*
*Claim 4 of Smith '366 in combination with Huddart*

Appellant argues claims 1–5, 7, 8, 10–12, 14–17, 19, 20, and 22–31 as a group. Appeal Br. 8–16. We select Claim 1 as representative. *See* 37 C.F.R. § 41.37(c)(1)(iv).

Smith '366 is a parent to the application under review. The Examiner finds that claim 4 of Smith '366, which depends from claim 1 thereof, discloses the invention substantially as claimed except for end connectors and corrugations in the tubing, for which the Examiner relies on Huddart. Final Act. 3–4. In particular, the Examiner finds that claim 9 of Smith '366, which also depends from claim 1 thereof, explicitly discloses that the entire conduit is of a water vapor permeable material. *Id.* at 4. The Examiner concludes that it would have been obvious to a person of ordinary skill in the art at the time the invention was made to modify the invention of claim 4 of Smith '366 with the teachings of Huddart to achieve the claimed invention.

_____

[3] This is a new ground of rejection set forth in the Examiner's Answer. Ans. 4.

Appeal 2021-004502
Application 15/633,557

*Id.* According to the Examiner, a person of ordinary skill in the art would have done this to provide flexibility and connectivity. *Id.*

Appellant argues that the Examiner's evidence fails to explicitly disclose a conduit that is formed "entirely" of a water vapor permeable hydrophilic polyester block copolymer material. Appeal Br. 9. Appellant characterizes the Examiner's conclusion that it would have been obvious to modify Smith '366 claim 4 so that the tube wall is formed "entirely" of permeable material as a "conclusory assertion." *Id.* Appellant further argues that the Examiner's evidence fails to recognize that a problem exists with respect to tubes that are not entirely made of permeable material and that, in the absence of recognition of such a problem, a person of ordinary skill in the art would not have been led to the Examiner's proposed modification. *Id.* at 10. Appellant accuses the Examiner of engaging in hindsight reasoning. *Id.*

Appellant also argues that, at the time of the invention, hydrophilic polyester block copolymer material was believed to be too fragile to make up the entire wall of the tube. Appeal Br. 10. Appellant faults the Examiner for looking to claim 9 of Smith '366 as evidence that claim 4 would have been obvious. *Id.* at 11–12 (citing MPEP § 804(II)(B)(2)). Appellant argues that using corrugations in hydrophilic polyester block copolymer material would not have been considered possible by a person of ordinary skill in the art apart from using Appellant's disclosure. *Id.* at 15. Appellant notes that Smith '366 claim 4 does not include corrugations and that Huddart, which is relied on as teaching corrugations, is made of non-breathable material. *Id.* Appellant cites Mr. Eaton's declaration testimony that a person of ordinary skill in the art would not have expected corrugations of breathable material

4

**Appx5**

Appeal 2021-004502
Application 15/633,557

to be useful because breathable material is thin, fragile, and weak. *Id.*[4]
Appellant acknowledges that claim 16 of Smith '366, which also depends
from claim 1 thereof, includes a corrugation limitation, but, nevertheless,
argues that it is improper for the Examiner to rely on claim 16 in addition to
claim 4 in a double patenting rejection. *Id.* at 16 ("Claim 16 cannot be used
as a basis for rejection in combination with Claim 4.").

Finally, Appellant argues that the Examiner fails to give proper
consideration to declaration testimony and extrinsic written publication
evidence. Appeal Br. 12–14. Appellant asserts that such evidence tends to
establish that a person of ordinary skill in the art would not have had a
reasonable expectation of success in making a tube out of hydrophilic
polyester block copolymer material that features corrugations. *Id.* at 15.

In response, the Examiner defends the reference to claim 9 of
Smith '366 in the final rejection, explaining that such was properly used in
construing the scope of the term "*at least a region*" in independent claim 1
from which claim 4 depends. Ans. 7–8. The Examiner construes "at least a
region" as claiming an open-ended range that includes the entirety of the
enclosing wall. *Id.* at 8. The Examiner, in essence, explains that the
limitation of claim 9 which, like claim 4, depends from claim 1, informs the
meaning and scope of the "at least a region" term in claim 1.

> The note of claim 9 in the writeup did not involve combining 9
> into 4 but was merely pointing out that claim 9 contemplates
> the "at least a region" of the enclosing wall, which is a range
> which includes at least a region and up to the entirety of the
> enclosing wall being of the material (claim 9).

*Id.* at 11.

---

[4] citing Declaration of Jason Eaton, dated September 15, 2020.

Appeal 2021-004502
Application 15/633,557

With respect to Appellant's argument that the cited evidence does not identify a "problem," the Examiner states that it would have been within the purview of one of ordinary skill in the art to make an enclosing wall entirely of permeable material. Ans. 9. The Examiner explains that a person of ordinary skill in the art would have reasoned that providing a greater region of permeability would provide more opportunity for passage of water vapor from the gas flow and, therefore would have recognized the benefit of increasing the area of permeability. *Id.* The Examiner further explains that the modification of Smith '366 claim 4 in the final rejection to include the entire wall, instead of just a portion thereof, is not based on claim 9, but rather, is based on the reasoning to allow for greater passage of water vapor. *Id.* at 11.

With respect to Appellant's extrinsic evidence, the Examiner states that such evidence was considered, but was not found to be persuasive. Ans. 11–12. For example, the Examiner notes that any indications in Appellant's Eaton Declaration and Painter[5] reference, to the effect that hydrophilic polyester block copolymer material lacks the structural integrity to constitute the entirety of the wall, are in derogation of the properly construed meaning and scope of the "at least a region" term in claim 1. *Id.* at 12. In the Examiner's own words:

> [T]he Painter reference was not being relied on in the current rejections. The patent claim 4 sets forth the same hydrophilic polyester block copolymer material as in the instant claims. Both the patent and the instant application share the same time of invention due to the priority claims; and therefore one of

---

[5] Chris J. Painter, *Waterproof, Breathable Fabric Laminates: A Perspective from Film to Market Place*, 26 J. Coated Fabrics 107–30 (1996).

6

Appeal 2021-004502
Application 15/633,557

> ordinary skill would expect the patent claim material to be
> capable of assuming the entirety of the wall.

*Id.* at 13.  Further in this regard, the Examiner poses the question:  "if
Appellant is suggesting that the patent claims were not capable of
constructing the entire outer wall of hydrophilic polyester block copolymer
then it is unclear how the instant invention does not suffer from the same
problems Appellant is pointing out."  *Id.* at 12.  The Examiner discounts
Appellant's Perma Pure reference as not probative of the issue at hand as it
relates to a different material than that contemplated by the claim.  *Id.*

With respect to Appellant's arguments concerning corrugations, the
Examiner states that claim 16 of Smith '366 is not relied on in the rejection
to disclose corrugations.  Ans. 14 ("This claim was merely mentioned in the
response to arguments to show that the patent device contemplated
providing corrugations").  Instead, the Examiner states that Huddart teaches
corrugations as a well-known feature that provides support while allowing
bending.  *Id.* at 13–14.  The Examiner further posits that Huddart's teaching
of corrugation would have motivated a person of ordinary skill in the art to
use corrugation with hydrophilic polyester block copolymer material.  *Id.*
The Examiner rebuts Appellant's arguments regarding reasonable
expectation of success by noting that such argument is in derogation of the
enablement of the claims of Smith '366.  *Id.* at 14.

In reply, Appellant argues that disclosure of a genus (Smith '366
claim 1) is not necessarily a disclosure of every species that is a member of
that genus.  Reply Br. 4–5.  Appellant argues that the Examiner's proposed
modification is not based on prior art but, instead, is based on the reasoning
to allow for passage of water vapor.  *Id.* at 5.  Appellant argues that, if a
proposed modification is not based on prior art, the rejection must be

7

**Appx8**

Appeal 2021-004502
Application 15/633,557

reversed. *Id.* (citing *In re Kaplan*, 789 F.2d 1574, 1580 (Fed. Cir. 1986)). Appellant then repeats its arguments based on declaration testimony. *Id.* at 5–6. Appellant also argues that the cost of the additional material necessary to make the tube entirely of breathable material would have discouraged a person of ordinary skill in the art from even attempting such. *Id.* at 6.

Obviousness-type double patenting is a judicially-created doctrine designed to "prevent claims in separate applications or patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1373 (Fed. Cir. 2005) (citation omitted). It prohibits the issuance of claims in a second patent that are "not patentably distinct from the claims of the first patent." *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985) (citations omitted). A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over the earlier claim. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001).

The obviousness-type double patenting analysis involves two steps: "First, the court 'construes the claim[s] in the earlier patent and the claim[s] in the later patent and determines the differences.' Second, the court 'determines whether those differences render the claims patentably distinct.'" *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1385 (Fed. Cir. 2010) (alteration in original) (quoting *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008)). A later claim that is not patentably distinct from an earlier claim is invalid for obviousness-type double patenting. *Id.* at 1385 (quoting *Eli Lilly*, 251 F.3d at 968).

8

Appeal 2021-004502
Application 15/633,557

Appellant repeatedly faults the Examiner for looking at claims in Smith '366 other than claim 4. In this regard, Appellant overlooks the reason for the Examiner's action, which renders such action entirely proper. It may be true that, when considering whether the invention defined in a claim of an application would have been an obvious variation of the invention defined in the claim of a patent, the disclosure of the patent may not be used as prior art. *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1279 (Fed. Cir. 1992). However, this does not mean that one is precluded from all use of the reference patent disclosure. *Abbvie Inc. v. Mathilda and Terence Kennedy Institute of Rheumatology Trust*, 764 F.3d 1366, 1380 (Fed. Cir. 2014). The Examiner is permitted to look outside of claim 4 of Smith '366 to its specification and other claims in order to ascertain the meaning and scope of claim 4 and claim 1 from which it depends. *Id.* Thus, although it may be impermissible to treat a patent disclosure as though it were prior art in a double patenting inquiry, such disclosure may be used during claim construction to determine claim scope in order to ascertain whether claims define an obvious variation of what is earlier disclosed and claimed. *Id.* at 1381 (quoting *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1378–79 (Fed. Cir. 2008).

Turning now to the instant case, claim 1 of Smith '366 recites that "at least a portion" of the enclosing wall is made of breathable material. Smith, claim 1. Claim 9 of Smith, which depends from claim 1, recites that the "entire" conduit is made of material that allows for the passage of water vapor. *Id.* claim 9. The question before us, then, is whether "at least a portion" should be construed as broad enough to encompass the "entire" wall. The phrase "at least a portion" defines an open-ended claim. *See*

9

**Appx10**

Appeal 2021-004502
Application 15/633,557

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376 (Fed. Cir. 2007) (explaining that open-ended claims are not inherently improper). The appropriateness of open-ended claims depends on the particular facts of the invention, the disclosure, and the prior art. *Id.* Construing Appellant's claim terms consistently across the various claims of Smith '366, claim 9 indicates that "at least a portion" includes the entire wall. *See Georgia-Pacific Corp., v. United States Gypsum Co.*, 195 F.3d 1322, (Fed. Cir. 1999) (explaining that a claim term cannot be given a different meaning in the various claims of the same patent). Appellant does not cite any evidence that tends to define an upper end of the range for either claim 1 or claim 4 that is some amount less than the entire wall. In other words, if the upper end of the range "at least a region" defines less than the entire wall, Appellant does not tell us what that upper end of the range is. At this juncture, it is worth noting that claim 4, which explicitly recites a hydrophilic polyester block copolymer material, does not further limit the scope of the claim with respect to the relative portion of the wall that is made of such breathable material. Claims App., claim 4. In our view, the Examiner's construction of "at least a portion" as encompassing the entire wall in both claim 1 and claim 4 is amply supported by the record.

Construing "at least a portion" in the manner used by the Examiner dispenses with Appellant's argument that the Examiner improperly relied on claim 9 as a prior art reference. We also consider Appellant's argument that a modification must be based on prior art to be unpersuasive. Contrary to Appellant's position, the Examiner is not modifying Smith '366 claim 4 by increasing the relative portion of the wall for which the hydrophilic polyester block copolymer material is used. Rather, the Examiner is merely

10

Appeal 2021-004502
Application 15/633,557

modifying claim 4 to exclude walls where only some portion that is less than

the entire wall is made of such material. Since the claim is already broad

enough to encompass the entire wall, we do not consider narrowing claim 4

to exclude walls with only portions of breathable material as requiring more

than ordinary skill.

We next consider Appellant's "corrugation" argument. Huddart

discloses a conduit for use in a respiratory system. Huddart, Abs. Huddart

differs from Smith '366 in that it reduces humidity by means of a heater wire

that is helically wound within the conduit rather than creating a conduit wall

that is breathable. *Id.* at 5, ll. 19–29. The Examiner finds, and Appellant

does not dispute, that using corrugations is a well-known feature that

provides the known benefit of support while allowing bending. Ans. 13–14.

This brings us to the question of whether a person of ordinary skill in

the art would have had a reasonable expectation of success in creating a

corrugated tube entirely out of hydrophilic polyester block copolymer

material. Appellant provides testimony from Mr. Eaton in support of its

argument that there would not have been a reasonable expectation of success

in corrugating hydrophilic polyester block copolymer material. Eaton Decl.

¶ 36.

After carefully considering Mr. Eaton's testimony, we are not inclined

to accord it much weight in our analysis. In the first instance, Mr. Eaton

offers an opinion as to the capabilities of a person of ordinary skill in the art

that we deem incorrect. Eaton Decl. ¶ 24. There are a number of factors

that should be taken into account in determining the level of ordinary skill,

including: (1) educational level of the inventor; (2) type of problems

encountered in the art: (3) prior art solutions to those problems; (4) rapidity

11

**Appx12**

Appeal 2021-004502
Application 15/633,557

with which innovations are made; (5) sophistication of the technology, and
(6) educational level of workers active in the field. Not all such factors may
be present in every case, and one or more of these or other factors may
predominate in a particular case. *Environmental Design, Ltd. v. Union Oil
Co. of Calif.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983). These factors are not
exhaustive but are merely a guide to determining the level of ordinary skill
in the art. *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256
(Fed. Cir. 2007). It does not appear that Mr. Eaton did a comprehensive
analysis of skill level using the various *Environment Design* factors.

Mr. Eaton testifies that his person of ordinary skill in the art would not
possess material science expertise and, therefore, would need to rely on
expertise of material scientists, chemists, researchers, and manufacturers of
raw materials for guidance regarding material properties. Eaton Decl. ¶ 25.
Such testimony does not comport with applicable law. Instead, the
applicable, hypothetical person of ordinary skill in the art is someone who is
well positioned within the applicable field of technology to make and use an
invention.

> The specification of a patent is not addressed to people who are
> ignorant about the subject-matter. It is addressed to people who
> know something about it . . . No description of the mechanism
> of a steamboat would be likely to enable an ordinary skilled
> builder of sail-boats or row-boats to make it, and if, as
> appellee's present theory implies, the only "art" concerned was
> the making of boats, a description which taught builders of
> stationary engines to make the mechanism of a steamboat was
> not sufficient. We think "the art or science to which (an
> invention appertains, or with which it is most nearly connected"
> is the most relevant art or science, i.e., the one whose adepts
> have the best chance of being "enable(d) ... to make, construct,
> compound, and use" the invention.

Appeal 2021-004502
Application 15/633,557

*Int'l Std Elec. Corp. v. Ooms*, 157 F.2d 73, 75 (D.C.Cir. 1946). Further in
that regard, when an invention, in its different aspects, involves distinct arts
(such as CPAP conduits and breathable materials that can be formed into
conduits), that specification is adequate which enables the adepts of each art,
those who have the best chance of being enabled to carry out the aspect
proper to their specialty. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188
F.3d 1362, 1373 (Fed. Cir. 1999); *In re Naquin*, 398 F.2d 863, 866
(CCPA 1968).

Furthermore, Mr. Eaton's testimony is undercut by the fact that he
relies on an erroneous claim construction. In paragraph 31 of his declaration
testimony, Mr. Eaton opines that a person of ordinary skill in the art would
not deem it to be an "obvious variation" to "make the leap" from a conduit
wall comprising "at least a region" to a wall that is "entirely" made from a
hydrophilic polyester block copolymer material. Eaton Decl. ¶ 31. For
reasons previously discussed, the proper construction of "at least a portion"
encompasses the entire wall at the upper end of the claimed range.
Therefore, no such "leap" is required. As previously discussed, the only
modification required is to limit the scope of the claim to eliminate
embodiments where only a portion of the wall is made of the breathable
material. This does not strike us as requiring a "leap" in technology,
particularly when a person of the appropriate skill level is used, rather than
Mr. Eaton's person of only partial skill.

Finally, Mr. Eaton's testimony fails to consider and balance the
respective requirements of enablement under 35 U.S.C. § 112 and
obviousness under 35 U.S.C. § 103 (as applicable in a nonstatutory double
patenting situation). Appellant is not entitled to designate two different

13

**Appx14**

Appeal 2021-004502
Application 15/633,557

persons of ordinary skill in the art; one for obviousness and the other for

enablement.  The hypothetical person of ordinary skill in the art for purposes

of determining whether the instant claims are patentably distinct from

claim 4 of Smith '366 is the same hypothetical person of ordinary skill in the

art that, for enablement purposes, must be capable of practicing the

invention without undue experimentation.  Specifically with respect to

Appellant's invention, if a person of ordinary skill in the art is capable of

making and using the invention of claim 1, using hydrophilic polyester block

copolymer material, and can do so without engaging in undue

experimentation, that same person brings an equivalent degree of skill to the

obviousness analysis before us.

    Mr. Eaton opines that, at the time of the invention, hydrophilic

polyester block copolymer material was "extremely thin and weak."  Eaton

Decl. ¶ 34.  In Mr. Eaton's own words:

> At the time of the invention, making an entirety of an
> expiratory limb wall from a breathable material would have
> presented significant obstacles . . . In my opinion, one of skill in
> the art at the time of the invention would not have believed an
> expiratory limb formed entirely of breathable material would
> have been a viable option *absent the teachings of the present
> application*.

Eaton Decl. ¶ 32 (emphasis added).  However, having invoked — "*the

teachings of the present application*" — Mr. Eaton never identifies what

teaching he is referring to and never attempts to reconcile how such teaching

impacts an analysis under obviousness as opposed to enablement.

    Assuming for the sake of argument that a person of ordinary skill in

the art would have discovered that an expiratory tube made "entirely" of

hydrophilic polyester block copolymer material would tend to collapse and,

14

**Appx15**

Appeal 2021-004502
Application 15/633,557

therefore, requires reinforcement, we are then faced with whether a person
of ordinary skill in the art would have been: (1) capable of; and
(2) motivated to — reinforce such material by corrugation. We are inclined
to agree with the Examiner that Huddart provides the requisite motivation.
This, then, just leaves the question of whether the person of ordinary skill in
the art is capable of reinforcing the breathable material by corrugation. Mr.
Eaton opines that his person of ordinary skill in the art is not capable of
doing so — "*absent the teachings of the present application*." Eaton Decl.
¶ 32. With that in mind, we look to Appellant's Specification to see whether
and to what extent Appellant teaches how to corrugate hydrophilic polyester
block copolymer material.

In reviewing Appellant's Specification, we observe that Appellant
teaches various techniques to reinforce its breathable material by means of
spiral or helical reinforcing members or annular hoop reinforcing members.
Spec. ¶ 35. Appellant also teaches that certain types of materials are suitable
for such reinforcing structure, such as polymer plastic materials. *Id.*
However, we are unable to locate any teaching in Appellant's disclosure
regarding how to corrugate hydrophilic polyester block copolymer material.
*See generally* Spec. Although Appellant presents opinion testimony from
Mr. Eaton that such corrugation likely could not have been achieved "*absent
the teachings of the present application*" (Eaton Decl. ¶ 32), Appellant does
not identify any such teachings in the Specification that would amount to an
enabling disclosure on the issue. *See generally* Appeal Br.; Reply Br. The
foregoing brings into sharp focus the Examiner's statement in the Answer:

> If Appellant is arguing that the tube having hydrophilic
> polyester block copolymer material of patent claim 4 cannot be
> provided with corrugations or wouldn't have a reasonable

15

Appeal 2021-004502
Application 15/633,557

      chance of success then *it is unclear how the instant claims are enabled* to be constructed as claimed.

Ans. 14 (emphasis added). Appellant makes no effort to address, much less rebut, the Examiner's statement in its Reply Brief. *See generally* Reply Br.

      Notwithstanding the foregoing, we are not inclined to find that Appellant's claims are not enabled. However, we are inclined to disagree with Mr. Eaton's opinion that the correct person of ordinary skill in the art would have been unfamiliar with the material properties of hydrophilic polyester block copolymer material. Appellant's Specification essentially admits that hydrophilic polyester block copolymer material, such as SYMPATEX®, was commercially available at the time of the invention. Spec. ¶ 28. An artisan must be presumed to know something about the art apart from what the references disclose and we think that this would extend to the properties of commercially available materials. *In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). Furthermore, the dearth of teaching disclosure in Appellant's Specification on how to corrugate hydrophilic polyester block copolymer material is instructive to our analysis here. If corrugating such material is as difficult and nonobvious as Appellant and Mr. Eaton would have us believe, we would expect Appellant to provide a comprehensive enabling disclosure so that a person of ordinary skill in the art could make and use the invention without undue experimentation. Now, in the absence of any such comprehensive teaching disclosure, we are led to the conclusion that no such teaching is provided because Appellant deemed it unnecessary as corrugating the material is merely a matter of exercising ordinary skill. *See In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) (explaining that, in the absence of specific description, it is appropriate to assume that anyone desiring to perform the claimed function would know how to do so).

16

Appeal 2021-004502
Application 15/633,557

Appellant's "cost" argument does not apprise us of Examiner error. "That a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some technological incompatibility. Only the latter fact would be relevant." *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983). Appellant's hindsight argument is similarly unpersuasive, the Examiner having provided a cogent rationale underlying the rejection, namely, to provide flexibility, connectivity, and pass water vapor. Final Act. 4. *See In re Cree, Inc.*, 818 F.3d 694, 702 n.3 (Fed. Cir. 2016) (explaining that a hindsight argument is of no moment where the Examiner provides a sufficient, non-hindsight reason to combine the references).

Finally, Appellant raises a new argument, for the first time, in its Reply Brief. Appellant asserts that the Examiner's rejection confuses "domination" with "double patenting." Reply Br. 4 (*citing Kaplan, supra*). This argument is untimely and will not be considered as it effectively deprives the Examiner of an opportunity to respond. Under our rules, any argument raised in the reply brief which was not raised in the Appeal Brief, or is not responsive to an argument raised in the Examiner's answer, including any designated new ground of rejection, will not be considered by the Board for purposes of the present appeal, unless good cause is shown. 37 C.F.R. § 41.41(b)(2). We have reviewed the Examiner's Answer and Appellant's Reply Brief and, in our view, the new "domination" argument is not responsive to any argument by the Examiner in the Answer and Appellant otherwise fails to demonstrate good cause for belatedly raising this issue.

17

Appeal 2021-004502
Application 15/633,557

However, even if we were to consider the argument (we do not), it is not persuasive. Domination grows out of the fact that one patent may have a broad or "generic" claim which "reads on" an invention defined by a narrower or more specific claim in another patent, the former "dominating" the latter because the more narrowly claimed invention cannot be practiced without infringing the broader claim. *Kaplan*, 789 F.2d at 1577. Thus, a first patent "dominates" a second patent if a claim of the first patent reads on a device according to the second patent. *Id.* This commonplace situation is not, *per se*, double patenting. *Id.* at 1577-78. It is well settled that the presence of domination does not preclude a double patenting rejection where a later filed application claim is an obvious variation of a claim from a dominating patent. *AbbVie,* 764 F.3d at 1379. Where the later claim is an obvious variation of an earlier claim, domination is an irrelevant fact. *Kaplan*, 789 F.2d at 1578.

In view of the foregoing discussion, it is our opinion that the Examiner's findings of fact are supported by a preponderance of the evidence and the Examiner's legal conclusion that Appellant's pending claims are not patentably distinct from claim 4 of Smith '366 as modified by Huddart is well-founded. Therefore, we sustain the Examiner's double patenting rejection of claims 1–5, 7, 8, 10–12, 14–17, 19, 20, and 22–31.

*Nonstatutory Double Patenting*
*of Claims 11, 12, 14–17, 19, 20, and 22 over*
*Claim 7 of Smith '020 in combination with Huddart*

Appellant argues claims 11, 12, 14–17, 19, 20, and 22 as a group. Reply Br. 3–4. Claim 11 is representative. 37 C.F.R. § 41.37(c)(1)(iv).

18

Appeal 2021-004502
Application 15/633,557

The Examiner finds that Claim 7 of Smith '020 discloses "the same hydrophilic polyester block copolymer material" as in pending claim 11 and that such material forms "substantially all" of the outer conduit wall. Ans. 5. The Examiner finds that claim 1 of Smith '020, from which claim 7 depends, recites lateral and longitudinal reinforcement of an outer expiratory conduit. *Id.* The Examiner relies on Huddart as satisfying the corrugation limitation of claim 11 of the instant application. *Id.* The Examiner concludes that it would have been obvious to a person of ordinary skill in the art at the time the invention was made to modify claim 7 of Smith '020 with Huddart to achieve the claimed invention. *Id.* According to the Examiner, a person of ordinary skill in the art would have done this to provide bending, flexibility, and connectivity. *Id.*

Appellant argues that the outer conduit of claim 7 of Smith '020 is insufficiently sturdy to be self-supporting, but nevertheless, has lateral reinforcement and also has longitudinal reinforcement that is distinct from the lateral reinforcement. Reply Br. 2. Appellant also argues that claim 7 of Smith '020 does not recite an enclosing wall formed "exclusively" of hydrophilic polyester block copolymer material. *Id.*

Appellant's arguments are not persuasive. For reasons that are essentially identical to those previously expressed with respect to the first ground of rejection, Huddart is combinable with Appellant's earlier patent claim and satisfies the recited corrugation limitation of Appellant's pending claim 11. With respect to Appellant's argument that claim 7 of Smith '020 does not recite an enclosing wall formed "exclusively" of hydrophilic polyester block copolymer material, we note that claim 7 does recite hydrophilic polyester block copolymer as the breathable material and that

19

**Appx20**

Appeal 2021-004502
Application 15/633,557

claim 1, from which it depends, recites an outer conduit "substantially all" of which is formed of breathable material. Smith '020, claims 1, 7. Appellant presents neither evidence nor persuasive technical reasoning that an enclosing wall that is formed "exclusively" of hydrophilic polyester block copolymer material is patentably distinct from an enclosing wall "substantially all" of which is formed from such material.

We are not apprised of error and, therefore, sustain the rejection of claims 11, 12, 14–17, 19, 20, and 22 over Claim 7 of Smith '020 in combination with Huddart.

CONCLUSION

| Claims Rejected | 35 U.S.C.§ | References/Bases | Affirmed | Reversed |
|---|---|---|---|---|
| 1–5, 7, 8, 10–12, 14-17, 19, 20, 22–31 | | Non-Statutory Double Patenting, Smith '366 (clm 4), Huddart | 1–5, 7, 8, 10–12, 14–17, 19, 20, 22–31 | |
| 11, 12, 14–17, 19, 20, 22 | | Non-Statutory Double Patenting, Smith '020 (clm 7), Huddart | 11, 12, 14-17, 19, 20, 22 | |
| **Overall Outcome** | | | 1–5, 7, 8, 10–12, 14-17, 19, 20, 22–31 | |

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).

AFFIRMED

20

**Appx21**

FPHCR.052C1                                                    PATENT

# COMPONENTS FOR BREATHING CIRCUITS

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]    This application is a continuation of U.S. Patent Application No. 12/328,200, filed December 4, 2008, which is a continuation of U.S. Patent Application No. 11/371,389, filed March 9, 2006, now abandoned, which is a division of U.S. Patent Application No. 10/622,755, filed July 18, 2003, now U.S. Patent No. 7,140,366, issued November 28, 2006, which is a division of U.S. Patent Application No. 09/850,797, filed May 8, 2001, now U.S. Patent No. 6,769,431, issued August 3, 2004, which claims the benefit of New Zealand Patent Application No. 504439, filed May 10, 2000 and New Zealand Patent Application No. 509041, filed December 20, 2000, all of which are incorporated by reference in their entirety. In addition, any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are incorporated by reference in their entirety.

## BACKGROUND TO THE INVENTION

1.    <u>Field of the Invention</u>

[0002]    The present invention relates to components for breathing circuits and in particular to components for use in the expiratory arm of a breathing circuit.

2.    <u>Summary of the Prior Art</u>

[0003]    In assisted breathing, particularly in medical applications, gases having high levels of relative humidity are supplied and returned through conduits of a relatively restricted size. Buildup of condensation on the inside wall of the conduit is a frequent result of this high humidity. In the prior art, attempts have been made to reduce the adverse effect of this condensation by either reducing the level of condensation or providing collection points in the conduit for draining condensed liquid from the conduit Reducing the condensation has generally been by maintaining or elevating the temperature of the gases flow and/or of the conduit wall to reduce the formation of condensation.

-1-

## SUMMARY OF THE INVENTION

[0004]    It is an object of the present invention to provide a component, with particular application to the expiratory limb of a breathing circuit, which will at least go some way towards improving on the above or which will at least provide the public and the medical profession with a useful choice.

[0005]    In a first aspect the invention consists in a breathing circuit component including an inlet, an outlet and an enclosing wall defining a gases passageway between said inlet and said outlet, at least a region of said wall being of a material that allows the passage of water vapor without allowing the passage of liquid water or respiratory gases.

[0006]    In a further aspect the invention consists in a breathing circuit limb having both inspiratory and expiratory gases passageways, each having a respective inlet and outlet and a wall defining a gases passageway extending from said inlet to said outlet, at least a region of the wall of the expiratory conduit being of a material that allows the passage of water vapor without allowing the passage of liquid water or respiratory gases.

[0007]    In a still further aspect the invention consists in a catheter mount including:

a short length of breathing conduit for connecting at one end to a patient interface component and at the other end to, directly or indirectly, the dual arms of a breathing circuit,

a dividing partition extending for at least a substantial part of the length of said breathing conduit and dividing, in cross section, said conduit into a plurality of gases passageways each having a defining passageway wall,

at least one of:

an inspiratory flow director for directing at least the bulk of an inspiratory air flow to a first selection of said passageways, and

an expiratory flow director for directing at least the bulk of an expiratory flow to a second selection of said passageways, said second selection being exclusive of said first selection,

-2-

and at least a region of the walls of said second selection of passageways being of a material that allows the passage of water vapor without allowing the passage of liquid water or respiratory gases.

[0008]    In a still further aspect the invention consists in a dedicated water vapor exchanger including an inspiratory gases pathway and an expiratory gases pathway having a common wall therebetween, said common wall including one or more regions of a material that allows the passage of water vapor without allowing the passage of liquid water or respiratory gases.

[0009]    In a still further aspect the invention consists in apparatus for forming a breathing circuit conduit comprising:

a former, onto which a tube wall can be deposited and which advances said deposited tube wall in an advance axis and rotates said deposited tube wall about said advance direction, the speed of said advance and the speed of said rotation together defining a pitch,

at least one film laying head which deposits a film on said former, the combined width of said film deposited by said film laying heads being wider than said pitch such that adjacent turns of laid film overlap to form an overlap seam,

a bead laying head for each said film laying head, each said bead laying head laying a reinforcing bead on an overlap seam,

an axial thread laying head, said thread laying head fitted over and around said former and carrying a plurality of thread feeds, each thread feed allowing the drawing of a thread from a reserve, and

a rotator to rotate said axial thread laying head at substantially the same speed as the expected rotation speed of said tube.

[0010]    Hereinafter, throughout the description, a material that allows the passage of water vapor without allowing the passage of liquid water or respiratory gases is described as a "breathable" material. Materials may be breathable due to their composition, physical structure a combination thereof.

[0011]    To those skilled in the art to which the invention relates, many changes in construction and widely differing embodiments and applications of the

-3-

invention will suggest themselves without departing from the scope of the invention as defined in the appended claims. The disclosures and the descriptions herein are purely illustrative and are not intended to be in any sense limiting.

BRIEF DESCRIPTION OF THE DRAWINGS

[0012]    Figure 1 is a cross sectional elevation of a conduit for the expiratory limb of a breathing circuit according to one embodiment of the present invention,

[0013]    Figure 2 is a cross sectional view of a section of conduit wall according to one possible construction,

[0014]    Figure 3 is a cross sectional view of a co extrusion die head for extruding a conduit including two longitudinal strips of permeable material, similar to the conduit of Figure 1,

[0015]    Figure 4 is a cross sectional elevation of a coaxial breathing circuit according to a further embodiment of the present invention and incorporating a conduit in accordance with the present invention,

[0016]    Figure 5 is a side elevation in partial cross section of the coaxial breathing circuit of Figure 4,

[0017]    Figure 6 is a side elevation partially in cross section of an expiratory limb conduit according to a further embodiment of the present invention,

[0018]    Figure 7 is a cross sectional side elevation of an expiratory limb for a breathing circuit according to a further embodiment of the present invention,

[0019]    Figure 8 is a cross sectional side elevation of an expiratory limb for a breathing circuit according to a still further variant,

[0020]    Figures 9a-9i demonstrate a range of conduit constructions including longitudinal reinforcement of varying types,

[0021]    Figure 10 is plain view of a conduit forming device for forming a reinforced twin walled conduit according to the present invention, such as the conduit depicted in Figures 9h or 9i,

[0022]    Figure 11 is a plain view of a conduit forming device for forming a reinforced conduit according to Figure 7,

-4-

[0023]    Figure 12 is a plain view of a similar conduit forming device for forming a reinforced conduit according to Figure 8, and

[0024]    Figure 13 is a cross sectional side elevation of a catheter mount incorporating the present invention.

DETAILED DESCRIPTION

[0025]    Referring to Figure 1 in one embodiment of the invention the conduit 4 of the expiratory limb of a breathing circuit is formed having one or more longitudinal strips 2, 3 of breathable membrane as part of the wall 1 thereof.

[0026]    One possible material for the breathable regions is an activated perfluorinated polymer material having extreme hydrophilic properties. An example of this polymer material is marketed under the trade mark NAFION by DuPont Fluoro products of Fayetteville USA. This material is useful due to its extreme hydrophilic properties and due to its ability to be extruded, particularly to be co-extruded in combination with other plastic materials.

[0027]    Alternative materials are also envisaged including:

(a) Hydrophilic thermoplastics,

(b) woven treated fabric products exhibiting breathable characteristics

[0028]    The preferred material is a hydrophilic polyester block copolymer formed into a homogeneous flat film. An example of such a film is sold under the brand SYMPATEX. This material is particularly suited to thin film productions.

[0029]    Referring to Figure 6 an alternative embodiment of the expiratory limb is shown in which the entire flexible wall membrane of the conduit is formed from a breathable plastic membrane, extruded and wound helically with edges of adjacent turns sealed to one another.

[0030]    Further variations on the embodiment of Figure 6 are depictured in Figures 9a to 9i, 7 and 8. In these figures the flexible wall membrane of the conduit is supplemented by reinforcing to provide resistance to lateral crushing and to longitudinal stretching of the conduit. Further variations are shown including variants having multiple breathable plastic membranes. Apparatus for forming such conduits is described with reference to Figures 10, 11 and 12.

-5-

[0031]     Referring to Figures 4 and 5 a further aspect of the present invention is shown in which an expiratory limb conduit according to the present invention is provided as the inner conduit of a coaxial conduit configuration, such that expiratory gases and inspiratory gases each flow in one of the inner conduit or the space between the inner conduit and the outer conduit and in use water vapor but not liquid water is transmitted from the expiratory gases passageway to the inspiratory gases passageway.

[0032]     A further component that may usefully include the present invention is a catheter mount. The application of the invention to a catheter mount is described with reference to Figure 13.

[0033]     It would be possible alternatively, to have one or more longitudinal sections (lengths) of the conduit being formed of the breathable material or isolated regions of the conduit wall being formed from the material. However the embodiments described herein are preferred due to their apparent simplicity of manufacture, being capable of linear manufacture, either by continuous stitching, gluing or welding, by co-extrusion or by winding onto a former.

[0034]     As a corollary of material cost it is preferred that the conduit wall be manufactured to have a relatively low wall thickness, so much so that the conduit wall membrane may be insufficiently sturdy to be self-supporting.

[0035]     Referring to Figures 2, 6, 9a to 9i, 7 and 8, a spiral or helical internal (or external) reinforcing members, or a series of annular hoop reinforcing members, may be provided outside (or inside) the tubular membrane to provide support. The helical, spiral or hoop supporting members may for example be formed from polymer plastic materials, such as the material used in the wall of the conduit (not being the breathable regions), or alternatively may for example be a metal wire support, such as drawn steel wire.

[0036]     The conduit shown in Figure 2 may be formed in any one of a number of methods. For example the tubular membrane may be supplied in a continuous tube. Alternatively it might be supplied in tape form, which may result in the conduit of Figure 6. Supplied as extruded tape, the membrane may be wound helically onto a former. The helical supporting rib, provided in a semi molten state is then laid on the overlap

-6-

between adjacent turns. The heat from the helical supporting rib bonds the two adjacent strips with the rib forming a flexible resilient conduit once cooled.

[0037]     Referring to Figure 6 an additional sheathing layer 83 may be provided over the outside of the conduit. The sheathing layer 83 is supported on the apexes of the ribs 30. The sheathing layer 83 may be a further strip or tape of extruded plastic film wound helically onto the conduit formed on the former. This additional sheath may have a number of purposes and benefits. The sheathing layer 83 may be formed to provide additional strength, reinforcement and protection, for example by selecting an appropriate material or by selecting an appropriate material thickness. The material may be a breathable material, such as that which may be the basis of the inner conduit wall or may be formed from a less expensive non-permeable material. In that case a series of holes or perforations 85 are preferably provided along the strip or tape 84 to provide egress of water vapor or collected condensed water. The holes or perforations 85 may advantageously be formed by pricking holes in the tape 84 using a heated lance during the forming process. Shrinking of the plastic film away from the heated lance has been found to produce consistent and suitably sized holes with an annulus of built up material providing reinforcing at the lip of the hole. The sheath 83, in addition to providing reinforcement and protection for the inner conduit, also provides a barrier to air flow over the inner conduit thereby providing an insulating effect. The insulating effect is greater where there are no perforations 85 through the sheath 83.

[0038]     Referring to Figures 9a-9i it has been found that one of the difficulties with using a breathable membrane such as SYMPATEX is its low elastic yield strength. Accordingly under longitudinal force the SYMPATEX membrane may be easily stretched non-elastically leading to loss of aesthetic appearance and a constriction in the tube diameter. The multiple walled embodiment described with reference to Figure 6 goes some way toward overcoming this difficulty, providing as it does a second layer of breathable material. Furthermore in the perforated form the outer plastic membrane may be formed from a plastic material having a greater elastic yield strength than the preferred SYMPATEX.

-7-

[0039]    An alternative structure may be used as a longitudinal reinforcement for the tube. This reinforcement is preferably provided in a form of an additional sheath having an open or mesh structure. For example the sheath may be provided by a plurality of parallel extruded polymer threads running parallel to the axis of the conduit, a plurality of extruded polymer threads braided or similarly arranged about the conduit and having a substantial axial component in their direction, or by a preformed or continuously formed mesh, formed to make a sheath in a similar fashion to the method used for forming the breathable wall. Such a mesh material may be produced by forming a non-woven or woven mesh of individual polymer threads or by stretching a micro perforated sheet to make an expanded mesh, or by other suitable processes. Part or each of these processes may be conducted at the time of, or immediately preceding, using the mesh in forming the reinforcing sheath.

[0040]    A variety of alternative conduit embodiments incorporating a reinforcing sheath, such as introduced above, are depicted in Figures 9a to 9i. Two other preferred forms are depicted in Figures 7 and 8. These embodiments have various advantages and/or disadvantages.

[0041]    Referring to Figure 9a a conduit is formed from an extruded tape 200 helically wound on a former to form the breathable wall. A mesh sheath 202 is formed from a mesh tape helically wound onto the outside of the breathable membrane 200. The overlapping edges of the mesh tape and the breathable membrane tape coincide and a molten plastic bead 201 is laid along these edges. The molten bead preferably provokes thermal bonding of all four coinciding layers, two of breathable membrane and two of polymer mesh. It will be appreciated that the polymer mesh may be on the inside or outside of the breathable membrane. However it is preferred that the internal surface of the conduit wall be smooth and hence it is preferred that the mesh tape be applied to the outside of the breathable membrane. It will be appreciated that each turn of mesh tape may be applied directly over each turn of breathable membrane contemporaneously so that the edges of adjacent turns overlap an edge of mesh tape comes between the edges of adjacent turns of breathable membrane tape, which is alternative to how it is depicted in Figure 9a. It will also be appreciated that either or both of the breathable membrane

-8-

tape and the mesh tape may be formed contemporaneously with forming the conduit therefrom and the mesh and membrane may accordingly bond over some or all of their contacting surfaces in addition to bonding achieved by heat from the bead 201.

[0042]    Referring to Figure 9b a conduit is formed having the same construction of breathable membrane 200, mesh 202 and bead 201. In addition a further sheath of breathable membrane 203 may be applied to the outside of the conduit, with the edges of adjacent urns 203 pressed onto and bonded to the outside of bead 201. This provides additional thermal insulation while allowing for dehumidification of the space between the inner and outer walls.

[0043]    Referring to Figure 9c the conduit of 9a is shown having breathable membrane wall 200, mesh sheath 202 and bead 201. In the embodiment of Figure 9c a further breathable membrane sheath 204 is provided on the outside of the mesh sheath 202. The effect of this is to encapsulate the mesh 202 providing an improved aesthetic appearance and more acceptable external surface. A disadvantage of his constriction is the multitude of layers which the heat from bead 201 is required to thermally bond. Accordingly a construction of this type may require additional localized heating to thermally weld the overlapping edges of adjacent turns of membranes 200, 202, and 204.

[0044]    Referring to Figure 9d a variation on the embodiment shown in Figure 9c is depicted. In this embodiment the outer breathable membrane 205 is inflated away from the mesh membrane 202 where in Figure 9c the outer breathable membrane 204 lay against or bonded with the mesh membrane 202. In Figure 9d the breathable 205 is supported away from the underlying membranes 200, 202 by an inflated pocket 211. This may be considered a variant of Figure 9b wherein the bead 201 is provided entirely on the outside of the conduit. The multitude of layers at adjoining edges poses the same forming difficulties as the embodiment of Figure 9c.

[0045]    Referring to Figure 9e a section of the conduit in which the mesh sheath is provided spaced from the breathable membrane conduit wall 200. The mesh sheath 206 is provided over the bead 201 at least in the vicinity of the joining of adjacent turns of the breathable membrane 200. Where the mesh sheath is formed from a wound tape, then adjacent turns 206 of the wound tape bond over the bead 201 upon action of

the heat residing in the bead 201. This embodiment reduces the number of adjacent layers required to be bonded by the bead 201 and allows the layers of breathable membrane and mesh respectively to operate independently making this tube more supple than for example for tube in Figure 9a.

[0046]    Figure 9f is a variation of the embodiment of Figure 9e. While an air space was provided between the mesh layer 206 and the breathable membrane layer 200 in Figure 9e, in Figure 9f the mesh layer 207 is shrunk, vacuumed or collapsed to lie adjacent the breathable membrane layer 200. Where one or more of the breathable membrane and mesh are formed contemporaneous with forming of the conduit then where these layers 207 and 200 meet they may bond across some or all of their contacting area. This embodiment provides the formative advantages of Figure 9e and a construction having similar qualities to that of Figure 9a.

[0047]    Referring to Figure 9g, in a further embodiment, an additional breathable membrane is provided to the embodiment of Figure 9f, spanning between turns of bead 201 and the outside of the mesh 207. To assist with bonding and for further reinforcement purposes a further bead 209 may be provided on the outside of the second breathable layer 208.

[0048]    Referring to Figure 9h a still further embodiment is shown, which is a variation of the embodiment shown in Figure 9g. In the embodiment of Figure 9h a second layer of breathable membrane 210 is provided on the outside of second bead 209. This is instead of being between the second bead 209 and the mesh layer 207 as the second breathable layer 208 was in the embodiment Figure 9g. This provides a larger included air space between breathable layers 202 and 210 and at any time only a double thickness of polymer, film or mesh is required to be bonded by the beads 201 or 209.

[0049]    Referring to Figure 9i a still further embodiment is shown, being a variation of the embodiment shown in 9h. In the embodiment of 9i the mesh layer 206 rather than being the deflated, collapsed or vacuumed form as in Figures 9f -9h, it is taut between turns of bead 201, in the fashion of 9e. This provides a pair of air spaces between the breathable layers 200 and 210, with the mesh layer 206 partially inhibiting the free air flow between the layers. However, this construction has the disadvantage that

-10-

the freely suspended mesh 206 may encourage rain out in the space enclosed between the breathable membranes 200 and 210, thereby retaining liquid water within the helical wall cavity.

[0050]    All of the above described configurations are considered to provide additional longitudinal reinforcement, with each having advantages and disadvantages, some of which have been specified. In forming these constructions bonding is required between some or all of the various layers, for example between the breathable membrane and one or other bead, the bead and the mesh, the mesh and breathable membrane. Accordingly, it is preferred that appropriately compatible materials are used for each element of the construction. For example while a molten polyester bead may mechanically bond adequately with nylon or polypropylene mesh a brittleness may develop and/or this impeded the simultaneous bonding of the bead with an adjacent layer of polyester based breathable membrane, for example in the embodiment of Figure 9a. Consequently it is preferred that all three elements have the same base polymer, and for example, for SYMPATEX which is polyester based product, a polyester bead and mesh are preferred.

[0051]    Further variations on the above embodiments may include replacement of the outer breathable layer in Figures 9b, c, d, g, h and i with a perforated non permeable layer, as desired. However, such variation does not provide the full insulative effect while retaining liquid vapor transmission from the insulating space to allow for further transmission through the conduit wall.

[0052]    An example of forming apparatus suitable for manufacturing the product the breathing tube according to the embodiments described in Figures 9a -9i is shown in Figure 10. In particular the apparatus is shown forming a conduit according to Figures 9h or 9i. The apparatus includes a former 300 preferably of a known type including a plurality of rotating rods arranged around a central support rod. The rods extend from and are rotated by a gearbox within a machine stock 301. At least in the tube forming region the rotating rods follow a helical path. The pitch angle of the rods relative to the support rod controls the pitch angle of the tube being formed. An example of such a machine is a spiral pipeline mandrel available from OLMAS SRL of Italy.

-11-

Tube being formed on the former is rotated and advanced in the direction of arrow 303 by the movement of the rotating rods. The advance speed of the former is selected relative to the rotational speed so that the pitch of the helical laying of the strip or tape on to the former 300 is a little less than the width of the strip so that adjacent turns narrowly overlap. A first extruder 304 extrudes a tape 314 of breathable polymer materials. The tape 314 deposits on the former 300 in a helical fashion by action of the former. The pitch of the helical disposition of tape 314 is slightly less than the width of tape 314. The helical deposition of tape 314 forms the inner breathable wall 200 of the conduit. A second extruder 305 extrudes a bead 315 of polymer material. The bead 315 deposits on the former over the joint or overlap between adjacent turns of tape 314 forming a raised bead 201 along this join. A tape 316 of reinforcing membrane is unrolled from a reel 306 to have edges depositing on adjacent turns of bead 201. The helically deposited reinforcing tape 316 forms reinforcing layer 206. A third extruder 307 extrudes a second molten polymer bead 317. The bead 317 is helically deposited along the overlap between adjacent turns of reinforcing tape 316. A fourth extruder 308 extrudes a second tape 318 of breathable polymer. The second tape 318 of breathable polymer is deposited on the former 300 to span between adjacent turns of second bead 317. Adjacent us of tape 318 overlap while sufficiently molten to fuse above the second bead 209, forming outer breathable sheath 210.

[0053]    In addition to the bonding of the film overlap by application of the molten bead other active fusing techniques may be applied. This may be particularly useful where a layer of longitudinal reinforcement or scrim is provided immediately adjacent the breathable film layer. Active methods may include hot air welding, hot rollers or radio frequency welding. In hot air welding a stream of hot air is blown on to the overlap of adjacent turns of breathable film, melting or fusing the adjacent edges together. This method has been found reasonably successful.

[0054]    For hot roller welding a heated roller or rollers run in contact with the overlap and melt the film together. Like hot air welding hot roller welding relies on the application of a localized direct heating to the film overlap.

-12-

[0055]    For radio frequency welding the film acts as an insulation layer between a pair of plates. A charge is passed between the plates melting and fusing the plastic film overlap together. The plates may take the form of a pair of rollers, one inside and one outside the tube, or a roller and one of the rotating rods of the former. Providing the plates as rollers (or as roller and forming mandrel) may render the radio frequency welding a continuous process with similar advantages to hot air welding and hot roller welding.

[0056]    In a further variation on the manufacturing process the breathable film tube may be manufactured having a longitudinal seam rather than being formed as a continuous helical strip. In such an embodiment a wider web of film would be wrapped around a mandrel as it is extruded or unrolled from a reel. Longitudinal edges would overlap and be seam welded by any of the above mentioned methods. A rotary extruder may then extrude a reinforcing bead or beads on to the plastic film. Further reinforcing or film layers and helical beads may be applied by additional wrapping stations or rotating extruders as required.

[0057]    Still other embodiments of a expiratory breathing conduit including longitudinal reinforcement are depicted in Figures 7 and 8. These embodiments utilize longitudinal reinforcing threads running parallel to the axis of the conduit.

[0058]    In the embodiment of Figure 7 the conduit includes an inner breathable polymer wall 250 with a plurality of axially extending reinforcing reads 251 running the length of said wall and spaced around the perimeter of the tube. The threads 251 are aligned parallel to one another and to the major axis of the conduit. A layer of additional longitudinal reinforcement 252, such as described earlier, and which may be a woven or non-woven mesh, aligned in any suitable orientation (although preferably aligned with the principal threads running at an angle to the major axis of said conduit) encloses the breathable permeable wall and reinforcing threads. A helical bead 253 is fused or adhered to the outside of the mesh 252.

[0059]    A preferred method of forming the tube according to the embodiment of Figure 7 is described with reference to the apparatus shown in Figure 11. In particular in the apparatus of Figure 11 both the inner, breathable, tube 250 and longitudinal

-13-

reinforcement layer 252 are formed by helically wrapping a preformed tape or strip of the base material (breathable polymer strip 260 or mesh strip 262 respectively) on to a rotating former 270 (such as described earlier with reference to Figure 10). The strip 260 or 262 unrolls from reels 273 and 274 respectively. Adjacent turns of breathable polymer 260 overlap at their edges. These overlapping edges are fused by thermal welding. Thermal welding is conducted as a continuous process by a hot air welding head 275. Rotation and advancement of the former 270 by the rotation head 271 continually passes the seam between adjacent edges of tape 260 past the head 275. A freely rotatable thread laying head 276 is located over the former 270 at a position between the hot air welding head 275 and the mesh spool 274. The rotating head 276 carries a plurality of spools 279 holding the reinforcing threads 251. The head 276 is rotatable by an electric motor and drive belt 277 and 278 respectively. The head 276 is preferably rotated at a speed synchronized with the speed of rotation of the former 270. Advancement of the former 270 draws thread 280 from the spools 279 to be laid as parallel threads 251 on the outside of the breathable membrane 250. The tape 262 of longitudinal reinforcement is subsequently applied over the threads 251 as a helical arrangement with edges of adjacent turns overlapping to form a continuous sheath. A bead 263 is extruded by an extruder 281 on to the overlap between adjacent turns of the mesh tape 262 to thereby form the helical reinforcing bead 253.

[0060]    This embodiment of the invention provides a breathable exhalation limb reinforced against crushing by the helical bead and against longitudinal extension by the axial threads 251. The mesh sheath 252 protects the axial threads from snagging or pulling.

[0061]    In the embodiment of Figure 8 the conduit includes an inner breathable polymer wall 350. A helical bead 353 is fused or adhered to the inner breathable wall 350. A plurality of reinforcing threads 251 running the length of the wall and spaced around the perimeter of the tube are aligned parallel to one another and to the major axis of the conduit. The threads 351 are supported on the helical bead 353, with the threads spanning the spaces between turns of the helical bead. In this embodiment it is important to choose the reinforcing threads (material, gauge and number) such that the

threads are sufficiently stiff to resist buckling under the transiently reduced internal pressures that could be expected during patient breathing. Unrestrained or excessive buckling of the threads could lead to unacceptable levels of conduit axial contraction. The axial threads 351 may be a spun or braided fibers, drawn or extruded mono filaments or other equivalent forms.

[0062]    A preferred method of forming the tube according to the embodiment of Figure 8 is described with reference to the apparatus shown in Figure 12. In particular in the machine of Figure 12 the breathable tube 350 is formed by helically wrapping a preformed tape or strip of breathable polymer strip 360 on to a rotating former 370. The strip 360 unrolls from reels 373. Adjacent turns of breathable polymer 360 overlap at their edges. These overlapping edges are fused by thermal welding. Thermal welding is conducted as a continuous process by a hot air welding head 375. Rotation and advancement of the former 370 continually passes the seam between adjacent turns of tape 360 past the head 375. A bead 363 is extruded by an extruder 381 on to the overlap between adjacent turns of the breathable tape 362 to thereby form the helical reinforcing bead 353. A freely rotatable threadlaying head 376 is located over the former after the bead extruder 381. The rotating head 376 carries a plurality of spools 379 holding the reinforcing threads 351. The head 376 is rotatable by an electric motor and drive belt 377 and 378 respectively. The head 376 is preferably rotated at a speed synchronized with the speed of rotation of the former 370. Advancement of tube along the former 370 draws thread 380 from the spools 379 to be laid as parallel threads 351 on the outside of the reinforcing bead.

[0063]    This embodiment of the invention provides a breathable exhalation limb reinforced against crushing by the helical bead and against longitudinal extension by the axial threads 351. The spanning threads prevent direct contact between a user and the surface of the breathable tube, reducing the risk of punctures and the like.

[0064]    It should be appreciated that with all of the forming methods involving winding of a narrow tape or strip to create a tube, it would be possible to wind two or more tapes or strips simultaneously onto the former so that the turns created by each tape are interposed by turns of other tapes, edges overlapping and being bonded

-15-

together. For example a pair of tapes may be laid as a double helix. This would require a multiplication in the number of forming stations associated with the wound on components of the tube or conduit.

[0065]     Referring to Figure 3 other forms of the conduit, such as that shown in Figure 1, may be formed by co extrusion of the breathable material (where the material is a suitable extrudable material) with a plastic material forming the remainder of the conduit wall. A suitable co extrusion die 9 is depicted in Figure 3 in which a pair of circumferential sections 7 of the die opening have the breathable plastic material extruded therethrough, and the remainder sections 8 of the annular extrusion opening have the non-permeable plastic wall material extruded therethrough.

[0066]     The purpose of the breathable region or regions of the conduit wall is to allow diffusion of water vapor from the expiratory limb of the breathing circuit along the path thereof independent of specific drain locations. This eliminates the buildup of condensation within the expiratory limb by drying the humidified gases during their flow through the expiratory limb. This furthermore reduces the humidity of the gases arriving at ancillary equipment, such as filters, ventilators and the like reducing the risk of condensation accumulation, thereby improving their operation.

[0067]     In accordance with a further aspect of the invention, and as exemplified in Figures 4 and 5 the conduit incorporating one or more longitudinal strips of breathable membrane may further be incorporated in a coaxial breathing circuit as a passive humidification device. In particular referring to the cross section in Figure 4 the coaxial breathing circuit may include an outer conduit 11 and an inner conduit 10. Preferably, for heat transfer reasons, the inner conduit 10 carries the inspiratory flow in the space 12 there within. The expiratory flow is preferably carried in the space 13 between the inner conduit 10 and the outer conduit 11. This airflow configuration is indicated by arrows 20, 19 respectively in Figure 5.

[0068]     The inner conduit 10 is formed having one or more longitudinal strips 2, 3 of breathable membrane in the wall 1 thereof, as has previously been described with reference to Figures 1, 2 and 3. Thus humidity in the expiratory flow space 13 may pass

through the sections 2, 3 of breathable membrane to humidify the inspiratory flow in inspiratory flow space 12.

[0069]    The breathable membrane works on relative partial pressures of water vapor so, with the flows in a counter flow arrangement substantial passive humidification of the inspiratory flow can be achieved.

[0070]    Referring to Figure 5 a circuit configured including the coaxial conduit depicted in Figure 4 is represented. In this circuit the conduit has a patient end connector 15 and a ventilator end connector 16 having inspiratory port 17 and an expiratory port 18. The inspiratory 20 and expiratory 19 counter flows are indicated.

[0071]    With the coaxial conduit the ventilator may not become aware of the leak in the interior conduit. Such a leak may short circuit the patient meaning that the patient will not be supplied with sufficient oxygen. Such a short circuit may be detected by placement of a sensor at the patient end. Preferably this sensor may be located in the patient end connector 15. A short circuit closer to the ventilator will lead to continued patient rebreathing of the air volume close to the patient. This will lead to a rise in the concentration of carbon dioxide in the conduit close to the patient which can be detected directly by a $CO_2$ sensor. Such a sensor may comprise any one of a number of such sensors as is currently commercially available. Alternatively this re breathing may be detected by monitoring the temperature of the gases at the patient end connector 15, wherein a rise in temperature above a predetermined level indicates that rebreathing is occurring.

[0072]    In addition to the above to reduce or eliminate the formation of condensation within either the inner or outer conduit, 10 or 11 respectively, and to maintain a substantially uniform temperature in the gases flow through the conduit, a heater means, such as a resistance heater wire, may be provided within either the inner or outer conduit, disposed within the gases spaces 12 or 13 or within the conduit walls themselves. In one possibility the heater wire may also serve as a reinforcing support (helical wire 25 in Figure 4) within the inner conduit 10 or in the outside conduit as with coaxial conduit.

-17-

[0073]    A further breathing circuit component to which the present invention can be applied is catheter mounts. A catheter mount connects between a patient interfacing component such as a mouth piece, nasal mask or endotracheal tube and the dual limbs of a breathing circuit. Connection with the dual limbs of the breathing circuit is generally via a wye connector. In the patient inhalation and exhalation cycle the dual limbs of the breathing circuit each have a distinct role, one as inhalation conduit and one as exhalation conduit. The catheter mount serves a dual role, transporting both inhaled and exhaled gases. Accordingly, the catheter mount can have significant disadvantages.

[0074]    A volume of exhaled air remains in the catheter mount between exhalation and inhalation. Accordingly some air is re-breathed by the patient. While not unacceptable, rebreathing is not generally desirable and where significant rebreathing is likely, a boost in oxygen supply levels may be required.

[0075]    Gases inhaled by a patient are, in a well-managed ventilation system, delivered in a condition having humidity near a saturation level and at close to body temperature, usually at a temperature between 33°C and 37°C. This temperature may be maintained by a heater in the inhalation conduit right up to the point where the gases enter the catheter mount. Gases exhaled by a patient are returned fully saturated and are subjected to further cooling as they flow through the catheter mount. Accordingly, although little condensation forms on the interior walls during patient inhalation, significant condensation levels may form during patient exhalation. The condensation, or rain out, occurring inside the catheter mount is particularly deleterious due to its proximity to the patient. Mobile condensate breathed or inhaled by a patient may lead to coughing fits or other discomfort.

[0076]    A catheter mount incorporating the present invention is depicted in Figure 13. The catheter mount incorporates the wye connector at the ventilator end. An internal conduit 455 extends coaxially with the outer conduit 456. The internal conduit 455 is supported at its patient end on an internal conduit connector 457 which is turn is supported via support struts 458 from patient end connector 459. The inner conduit 455 is supported at its other end on an inner conduit connector 460 which forms part of the ventilator end connector 461.

-18-

[0077]    In the catheter mount of Figure 13 the ventilator end inner conduit connector 460 communicates with the inspiratory conduit connector 462. The outer conduit 456 has at least a part of its wall being made from a breathable material. Preferably the outer conduit 456 is formed entirely from breathable material, and may also include lateral reinforcement (a spiral reinforcing bead 467) and longitudinal reinforcement (axially oriented threads 490) on the outside thereof. When constructed according to the manner earlier described with respect to Figures 12 and 8 the spiral bead 467 is laid on the overlap between consecutive turns of the extruded tape and assists fusion of the overlap and reinforcement against crushing.

[0078]    Therefore in use the catheter mount according to Figure 13 has an inspiratory flow entering the catheter mount a s indicated by arrow 470. The inspiratory flow passes through the inner conduit to exit to the patient through the patient end connector 459 as indicated by arrows 471. Upon patient exhalation, whether assisted or otherwise, expired gases pass through connector 459 and into the space surrounding the inner conduit 455 as indicated by arrows 472. These gases pass along the inside of the wall of outer conduit 456 as indicated by arrows 473 and out through the expiratory tube connector 463 of ventilation connector 461 as indicated by arrow 474. In passing through the catheter mount within the space between the inner conduit 455 and the outer wall 456 water vapor may pass through the water vapor permeable portions of the outer conduit 456. Preferably the entire of outer conduit 456, apart from any reinforcing rib, is breathable. In this way, although the expired gases may experience some temperature drop as they pass through the catheter mount to the expiratory conduit connector 463, hand in hand with this temperature drop is a reduction in humidity by water vapor passing through the breathable membrane of the outer conduit. Accordingly, relative saturation of the expiratory flow is reduced and rain out is reduced.

[0079]    The catheter mount incorporating features according to the present invention includes explicit division of the inspiratory and expiratory flows through the catheter mount, significantly reducing rebreathing. Rain out is also reduced by reducing the humidity of the expired gases even as the temperature of those gases reduces.

-19-

[0080]    While some embodiments of the present invention have been described as preferred and convey particular advantages over other embodiments many other combinations may prove commercially useful.

-20-

**Application No.:    15/633557**
**Filing Date:    June 26, 2017**

## AMENDMENTS TO THE SPECIFICATION

Changes to the specification are shown below in highlighted form, where insertions appear as underlined text (e.g., <u>insertions</u>), while deletions appear as strikethrough text (e.g., ~~deletions~~) or enclosed in double brackets (e.g., [[deletions]]).

**<u>In the Written Description:</u>**

- Please replace paragraph 24 with the following amended paragraph.

**[0024]** Figure<u>s</u> 13<u>a and 13b</u> ~~is a~~ <u>are</u> cross sectional side elevation<u>s</u> of ~~a~~ catheter mount<u>s</u> incorporating the present invention.

- Please replace the paragraphs 77 through 79 with the following amended paragraphs.

**[0077]** In the catheter mount<u>s</u> of Figure<u>s</u> 13<u>a and 13b</u> the ventilator end inner conduit connector 460 communicates with the inspiratory conduit connector 462. The outer conduit 456 has at least a part of its wall being made from a breathable material. Preferably the outer conduit 456 is formed entirely from breathable material, and <u>as shown in Figure 13a</u> may also include lateral reinforcement (a spiral reinforcing bead 467) and longitudinal reinforcement (axially oriented threads 490) on the outside thereof. When constructed according to the manner earlier described with respect to Figures 12 and 8 the spiral bead 467 is laid on the overlap between consecutive turns of the extruded tape and assists fusion of the overlap and reinforcement against crushing.

**[0078]** Therefore in use <u>each of </u>the catheter mount<u>s</u> according to Figure<u>s</u> 13<u>a and 13b</u> has an inspiratory flow entering the catheter mount as indicated by arrow 470. The inspiratory flow passes through the inner conduit to exit to the patient through the patient end connector 459 as indicated by arrows 471. Upon patient exhalation, whether assisted or otherwise, expired gases pass through connector 459 and into the space surrounding the inner conduit 455 as indicated by arrows 472. These gases pass along the inside of the wall of outer

**Application No.:     15/633557**
**Filing Date:     June 26, 2017**

conduit 456 as indicated by arrows 473 and out through the expiratory tube connector 463 of ventilation connector 461 as indicated by arrow 474. In passing through the catheter mount within the space between the inner conduit 455 and the outer wall 456 water vapor may pass through the water vapor permeable portions of the outer conduit 456. Preferably the entire of outer conduit 456, apart from any reinforcing rib, is breathable. In this way, although the expired gases may experience some temperature drop as they pass through the catheter mount to the expiratory conduit connector 463, hand in hand with this temperature drop is a reduction in humidity by water vapor passing through the breathable membrane of the outer conduit. Accordingly, relative saturation of the expiratory flow is reduced and rain out is reduced.

[0079]    The catheter mounts incorporating features according to the present invention include[[s]] explicit division of the inspiratory and expiratory flows through the catheter mount, significantly reducing rebreathing. Rain out is also reduced by reducing the humidity of the expired gases even as the temperature of those gases reduces.

-3-

**Appx84**

**Application No.:     15/633557**
**Filing Date:     June 26, 2017**

### AMENDMENTS TO THE SPECIFICATION

Changes to the specification are shown below in highlighted form, where insertions appear as underlined text (e.g., <u>insertions</u>), while deletions appear as strikethrough text (e.g., ~~deletions~~) or enclosed in double brackets (e.g., [[deletions]]).

### In the Written Description:

- Please replace paragraph 1 with the following amended paragraph.

**[0001]**     This application is a ~~continuation~~ <u>division</u> of U.S. Patent Application No. 12/328,200, filed December 4, 2008, which is a ~~continuation~~ <u>division</u> of U.S. Patent Application No. 11/371,389, filed March 9, 2006, now abandoned, which is a division of U.S. Patent Application No. 10/622,755, filed July 18, 2003, now U.S. Patent No. 7,140,366, issued November 28, 2006, which is a division of U.S. Patent Application No. 09/850,797, filed May 8, 2001, now U.S. Patent No. 6,769,431, issued August 3, 2004, which claims the benefit of New Zealand Patent Application No. 504439, filed May 10, 2000 and New Zealand Patent Application No. 509041, filed December 20, 2000, all of which are incorporated by reference in their entirety. In addition, any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are incorporated by reference in their entirety.

Application No.:    15/633,557
Filing Date:        June 26, 2017

## AMENDMENTS TO THE SPECIFICATION

Please amend the specification as follows.  Insertions appear as underlined text (e.g., insertions) while deletions appear as strikethrough text (e.g., ~~deletions~~).  Applicant asserts that no new matter is added by these amendments.

**Please amend paragraph [0072] as follows:**

[0072]      In addition to the above to reduce or eliminate the formation of condensation within either the inner or outer conduit, 10 or 11 respectively, and to maintain a substantially uniform temperature in the gases flow through the conduit, a heater means, such as a resistance heater wire 41, may be provided within either the inner or outer conduit, disposed within the gases spaces 12 or 13 or within the conduit walls themselves. In one possibility the heater wire may also serve as a reinforcing support (helical wire 25 in Figure 4) within the inner conduit 10 or in the outside conduit as with coaxial conduit.

**Please insert the following paragraph before paragraph [0010]:**

A further aspect of the disclosure includes a breathing circuit component including an inlet, an outlet and an enclosing wall defining a gases passageway between said inlet and said outlet, at least a region of said wall being of a material that allows the passage of water vapour without allowing the passage of liquid water or respiratory gases. Wherein said material is a hydrophilic polyester block copolymer. Wherein said gases passageway is an expiratory conduit and said region or regions is or are distributed over the length of said conduit. Wherein said region or regions are elongate and run at least a substantial part of the length of said conduit. Further including a series of said regions spaced along the length of said conduit. Wherein said conduit including said regions is extruded. Wherein the entire of said extruded tube is of a material that allows the passage of water vapour without allowing the passage of liquid water or respiratory gases. Wherein said regions of a material that allows the passage of water vapour without allowing the passage of liquid water or respiratory gases are one or more longitudinal strips running the complete length of said conduit. Wherein said conduit includes at least one helically wound polymer tape or strip, part or all of said strip being of a material that allows the

-2-

**Appx384**

**Application No.:**    **15/633,557**
**Filing Date:**        **June 26, 2017**

passage of water vapour without allowing the passage of liquid water or respiratory gases, respective edges of adjacent turns of said strip being adjoining or overlapping and bonded. Wherein said conduit includes at least one longitudinal strip, part or all of said strip being of a material that allows the passage of water vapour without allowing the passage of liquid water or respiratory gases, said strip or strips extending parallel to the axis of said conduit, edges of said strip or strips adjoining or overlapping to form an enclosed tube and bonded. Wherein said conduit is a blown film tube of a material that allows the passage of water vapour without allowing the passage of liquid water or respiratory gases. Further including including lateral reinforcement against crushing. Wherein said lateral reinforcement includes a plurality of annular corrugations distributed over the length of said conduit. Wherein said lateral reinforcement is a helical bead or a series of annular ring beads or ribs distributed over the length of said conduit.



**FIGURE 1**



**FIGURE 2**

**FIGURE 3**





# FIGURE 4



# FIGURE 5

3/9



**FIGURE 6**



**FIGURE 7**



**FIGURE 8**

5/9



FIGURE 9a

FIGURE 9b

FIGURE 9c

FIGURE 9d

FIGURE 9e



FIGURE 9f

FIGURE 9g

FIGURE 9h

FIGURE 9i

Case: 23-1558    Document: 12    Page: 111    Filed: 08/14/2023



**FIGURE 10**



**FIGURE 11**



**FIGURE 12**



**FIGURE 13**

9/9



FIGURE 13a



FIGURE 13b



# FIGURE 4



# FIGURE 5

Application No.:    15/633,557
Filing Date:       June 26, 2017

### AMENDMENTS TO THE CLAIMS

Please replace all prior versions of the claims with the following listing of the claims. Please note that in the amendments to the claims, deletions are indicated by strikethrough (e.g., ~~deletion~~) or double brackets (e.g., [[word]]) and additions are underlined (e.g., addition).

1.    (*Currently Amended*)  An expiratory tube comprising:

a first end connector terminating a first end of the expiratory tube, wherein the first end connector is configured to connect to a ventilator;

a second end connector terminating a second end of the expiratory tube, wherein the second end connector is configured to connect to a patient interface component; and

a flexible enclosing wall defining a single gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible enclosing wall including corrugations and formed entirely of a hydrophilic polyester block copolymer material, wherein the flexible enclosing wall separates the single gases flow passageway from ambient air, the corrugated hydrophilic polyester block copolymer material configured to reduce [[a]] humidity of gases in the single gases flow passageway by diffusion from the single gases flow passageway through the flexible enclosing wall directly to ambient air;

wherein the expiratory tube forms an expiratory limb of a breathing circuit.

2.    (Previously Presented)  The expiratory tube of Claim 1, further comprising a heater structure located within at least one of the single gases flow passageway or the flexible enclosing wall, the heater structure comprising a heater wire, wherein the heater structure runs at least a portion of a length of the expiratory tube.

3.    (*Currently Amended*) The expiratory tube of Claim 1, wherein the expiratory tube is configured to reduce condensation within the single gases flow passageway.

4.    (Previously Presented)      The expiratory tube of Claim 1, wherein the expiratory tube is formed as a single continuous uniform tube between the first end connector and the second end connector.

5.    (Previously Presented) The expiratory tube of Claim 4, wherein the flexible enclosing wall is extruded.

6.    (Cancelled)

-2-

**Application No.:    15/633,557**
**Filing Date:        June 26, 2017**

7.    (Previously Presented) The expiratory tube of Claim 1, wherein the expiratory tube does not include collection points for draining condensed liquid from the expiratory tube.

8.    (Previously Presented) The expiratory tube of Claim 1, wherein the expiratory tube is configured to reduce humidity of gases flowing through the single gases flow passageway due to a difference in relative partial pressures of water vapor between an interior of the single gases flow passageway and ambient conditions outside of the flexible enclosing wall.

9.    (Cancelled)

10.    (Previously Presented) The expiratory tube of Claim 2, wherein the heater wire is arranged in a helical configuration.

11.    (Previously Presented) An expiratory tube comprising:

a first end connector terminating a first end of the expiratory tube;

a second end connector terminating a second end of the expiratory tube; and

a flexible enclosing wall defining a gases flow passageway of the expiratory tube between the first end connector and the second end connector, the flexible enclosing wall including corrugations and formed exclusively of a hydrophilic polyester block copolymer material that is configured to reduce humidity of gases in the gases flow passageway through diffusion directly to ambient air;

wherein the expiratory tube forms an expiratory limb of a breathing circuit.

12.    (Previously Presented) The expiratory tube of Claim 11, wherein the expiratory tube is configured to reduce condensation within the gases flow passageway.

13.    (Cancelled)

14.    (Previously Presented) The expiratory tube of Claim 11, wherein the flexible enclosing wall is extruded.

15.    (Previously Presented)        The expiratory tube of Claim 14, wherein the expiratory tube is formed as a single continuous uniform tube between the first end connector and the second end connector.

16.     (Previously Presented) The expiratory tube of Claim 15, wherein the first end connector is configured to connect to a ventilator.

17.    (Previously Presented) The expiratory tube of Claim 16, wherein the second end connector is configured to connect to a patient interface component.

18.    (Cancelled)

-3-

**Appx762**

**Application No.:**     15/633,557
**Filing Date:**         **June 26, 2017**

19.     (Previously Presented) The expiratory tube of Claim 11, wherein the expiratory tube does not include collection points for draining condensed liquid from the expiratory tube.

20.     (Previously Presented) The expiratory tube of Claim 11, wherein the flexible enclosing wall reduces the humidity within the expiratory tube due to a difference in relative partial pressures of water vapor between an interior of the gases flow passageway and ambient conditions outside of the flexible enclosing wall.

21.     (Cancelled)

22.     (Previously Presented) The expiratory tube of Claim 11, wherein the expiratory tube further comprises a helical heater wire.

23.     (Previously Presented)  An expiratory limb comprising:

a first end connector terminating a first end of the expiratory limb;

a second end connector terminating a second end of the expiratory limb; and

a flexible tubular portion defining a single gases flow passageway connecting the first end connector and the second end connector, the flexible tubular portion consisting essentially of a hydrophilic polyester block copolymer material, wherein the flexible tubular portion separates the single gases flow passageway from ambient air along an entire length of the flexible tubular portion, the hydrophilic polyester block copolymer material configured to reduce humidity of gases in the single gases flow passageway through diffusion from the single gases flow passageway through the flexible tubular portion directly to ambient air;

wherein the expiratory limb forms part of a breathing circuit.

24.     (Previously Presented)   The expiratory limb of Claim 23, wherein the flexible tubular portion is corrugated.

25.     (Previously Presented)   The expiratory limb of Claim 23, further comprising a heater structure located within at least one of the single gases flow passageway or the flexible tubular portion, the heater structure comprising a heater wire, wherein the heater structure runs at least a portion of a length of the expiratory limb.

26.     (Previously Presented) The expiratory limb of Claim 25, wherein the heater wire is arranged in a helical configuration.

27.     (***Currently Amended***) The expiratory limb of Claim 23, wherein the flexible tubular portion is configured to reduce condensation within the single gases flow passageway.

-4-

**Appx763**

**Application No.:**    **15/633,557**
**Filing Date:**        **June 26, 2017**

28.    (Previously Presented)        The expiratory limb of Claim 23, wherein the flexible tubular portion is formed as a single continuous uniform material between the first end connector and the second end connector.

29.    (Previously Presented) The expiratory limb of Claim 27, wherein the flexible tubular portion is formed by extrusion.

30.    (Previously Presented) The expiratory limb of Claim 23, wherein the flexible tubular portion does not include collection points for draining condensed liquid.

31.    (Previously Presented) The expiratory limb of Claim 23, wherein the flexible tubular portion is configured to reduce the humidity of gases flowing through the single gases flow passageway due to a difference in relative partial pressures of water vapor between an interior of the single gases flow passageway and ambient conditions outside of the flexible tubular portion.

-5-

# <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a).  This brief contains 8,728 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font Times New Roman.


                           KNOBBE, MARTENS, OLSON & BEAR, LLP

August 14, 2023            /s/ *Benjamin J. Everton*_____
                           Benjamin J. Everton

                           *Attorneys for Appellant*
                           FISHER & PAYKEL HEALTHCARE LIMITED